(Hamilton County Court of Insolvency.)

IN THE MATTER OF THE ASSIGNMENT OF THE COMMERCIAL BANK.

---

*Insolvent bank—Officers carrying on business with knowledge of insolvency of bank—Right of customers to recover their money.*

Where it appears that a bank has been insolvent for a long time before the assignment, to the knowledge of the directors and officers of the bank, it was a fraud on the part of such officers to continue to do business, and persons having entrusted money to the bank, may recover it back if it can be identified. But where the money can not be identified, but was mingled with the funds of the bank, and the condition of the bank during the time was not worse than months before, they must take their chances with the other creditors of the bank. But where the money came into the hands of the bank impressed with a special trust, the assignee will have to refund it out of any money of the bank in his hands.

(August, 1895.)

---

McNEILL, J.

On March 27, 1895, at 3.48 o'clock p. m., the Commercial Bank made an assignment for the benefit of its creditors, under the provisions of the Ohio insolvent laws.

A number of intervening petitions have been filed herein asking for return of deposits, proceeds of drafts and checks, etc., deposited in the bank just prior to its failure, by the several petitioners; and others asking that money deposited in the bank may be set off against paper held by the trustees against the several petitioners, etc. These petitions were all heard together upon testimony and submitted to the court for determina-

tion.   The evidence submitted shows that on the morning of March 27, 1895, the date of the assignment, a committee from the Cincinnati clearing house visited the bank and made an investigation as to its solvency. This investigation was brought about by the fact that the bank had been slow in meeting its obligations to the clearing house, and a current rumor in banking circles that the bank was in distress.   The committee finished its investigation at 1.30 to 2 o'clock p. m.   The result was that the clearing house refused to grant the bank any further assistance, and all the "hold over" checks of the bank held by other banks were sent to the clearing house that day.   The bank was informed of the action of the clearing house at 2.15 to 2.20 o'clock p. m. on that day.   The result was that the bank was unable to get through the clearing house by many thousand dollars, and the assignment was made the same afternoon.   The bank is shown to be badly insolvent.   It further appears that the bank had not suffered any recent serious losses, and that its condition at the time of its failure was not materially different from what it had been for more than a year prior thereto.   So that the bank had been in a badly insolvent condition for more than a year prior to the assignment, and there can be no question but that the officers of the bank knew of its condition during that time.   A careful examination of the affairs of the bank shows that, reckoned upon a fair business basis, the liabilities of the bank exceeded its assets by at least $200,000, and yet during all this time the doors of the bank were open, deposits were received and business carried on with its customers, all of whom were in total ignorance of its condition.   No matter what the actual intention of the officers of the bank might be, in law their action was fraudulent toward every person whose money was received while the bank was in that condiion.

In Anonymous Case, 67 N. Y. 598, the Supreme Court of New York decided that "in the case of bankers, where greater confidence is asked and reposed, and where dishonest dealings may cause widespread disaster, a more rigid responsibility for good faith and honest dealing will be enforced than in the case of merchants and other traders;" and "that a banker, who is to his own knowledge, hopelessly insolvent, can not honestly continue his business and receive the money of his customers; and although having no actual intention to cheat and defraud a particular customer, he will be held to have intended the inevitable consequences of his act, i. e., to cheat and defraud all persons whose money he receives, and whom he fails to pay before he is compelled to stop business." This language is quoted with approval by Chief Justice Fuller in his opinion, in St. Louis, etc., Ry. Co. v. Johnston, 133 U. S. 566, and by Andrews, J., in his opinion in Cragie et al. v. Hadley, 99 N. Y. 131.

Holding, therefore, as I do, that the Commercial Bank had no right to continue business after its insolvent condition became known to its officers, and that its condition was known to said officers for more than a year prior to the assignment, it follows that, although its officers may have had no actual intent to defraud any particular customer, they will be held to have intended the natural consequences of their acts, i. e., to defraud all persons whose money the bank received and failed to pay before it stopped business.   It follows, therefore, that if the money deposited by a customer, or any person, has not lost its identity, it may be recovered back.

But in case the identity of the money deposited has been lost, keeping in view the fact that the bank was at the time of the failure in no worse condition than it was for months before, I can see no reason why money left there by another customer should be taken in its stead.   Hence there should be no distinction between depositors, the identity of whose money

has been lost, and the mere fact that one deposit was a little nearer to the time of the failure of the bank should make no difference. As to all such parties, Equity is equality." Morse on Banking, sec. 630.

I will now consider the several cases presented separately:

### Money Collected by the Assignee.

The petition of Rebecca E. Thomas alleges—and the evidence submitted sustains the allegations—that having received from a party in the West a draft for $500.00 on a bank in New York, she deposited the same in the Commercial Bank on the day it failed. The draft was forwarded to New York, and was duly paid and the proceeds came into the hands of the assignee of the bank after his appointment, and are now in the hands of the trustees. Under the authorities above cited, Mrs. Thomas is entitled to have said proceeds paid over to her. Ben B. Dale, attorney.

### Money Collected by the Bank Before the Assignmnet.

The petition of Dittoe & Wisnell is for the proceeds of a check of Wm. Gerdes, drawn on the bank of S. Kuhn & Sons, to their order, and which they deposited in said bank on the day it failed. The proceeds were appropriated by the bank before the assignment, and did not come into the hands of the trustees. The prayer of the petition for an order requiring the trustees to repay the money is refused. Greene Fenley, attorney.

### Money Deposited on the Day of the Assignment and Mingled with the Bank Funds.

The petition of the Union News Company is for the return of $325.50 in money deposited in the said bank on the day of the failure. The money has not been identified or traced into the hands of the trustees. The prayer of the petition for repayment of the money is refused. Joseph Cox, Jr., attorney.

### Money Checked Against in Payment of a Draft.

The petition of J. W. S. Evans shows that on the day said bank failed he deposited therein $150, and at the same time he purchased from the bank a draft on New York for $125, which was returned unpaid. The money deposited out of which the draft was purchased has not been identified, and I can see no reason why the application of a part of it to the purchase of a draft can make any difference. It is the right to reclaim his own, no matter what form the transaction may have assumed, that governs. Hence, not having identified his money, or traced it into the hands of the trustees, the prayer of the petition for the repayment of the money is refused. Ben B. Dale, attorney.

### Drafts Purchased by Check on the Bank.

The petition of A. C. Barney, agent for Ellen M. Pike and others, is for the repayment of $5,000, being the amount of three drafts on New York for $500, $1,500 and $3,000, respectively, purchased of the Commercial Bank on March 27, the date of its failure. Barney, as such agent, was a depositor in said bank, and paid for the drafts by checks on his account with the bank. There has been no identification of the money, nor has it been traced into the hands of the trustees. This case is in all respects similar to the Evans case above, and for the same reasons the prayer of the petition is denied. Jones & James, attorneys.

### Evidence to be Supplied as to a Collection.

The petition of August Renesch sets forth that he was a customer of the Commercial Bank; that on the day of its failure he deposited therein

a draft issued by the Western Bank of Louisville, Ky., for $106.82, on the Central National Bank of New York, properly indorsed; that the proceeds of the draft have been received by the assignee, William H. Campbell, after his appointment. The point is made that no evidence has been submitted that the money came into the possession of said assignee or the trustees. But the estate is in the custody of the law, and the trustees are officers of the court, so that the information is within the control of the court. Therefore if the proceeds of the draft have been received by the assignee or trustees, an order will be entered that the money be refunded; otherwise the prayer of the petition will be denied. Daniel Wilson and L. C. Black, attorneys.

### Another Lack of Evidence.

The petition of Byron H. Hathaway, receiver, is for the proceeds of a check for $75, drawn in his favor by P. J. Kelly on the Citizens' National Bank of Cincinnati, and deposited in the Commercial Bank on the day of the assignment, and the proceeds of which, it is alleged, came into the hands of the assignee after the assignment. The same objection is made in behalf of the trustees as in the Renesch case above, that no proof has been submitted as to the receipt of the proceeds by the assignee or trustees. The same ruling is made as in the Renesch case. Peck & Shaffer, attorneys.

### Money and Check Deposited Together.

The petition of J. A. Scholl asks for the repayment of $204 in money, and the proceeds of a check for $17.65 in his favor, drawn by John Brannon, all of which was deposited in the Commercial Bank about 2 o'clock on the day of the failure. The money was not kept separate from the other funds of the bank, and its identity was lost. The prayer of the petition as to the money will be denied. But if the proceeds of the check came into the hands of the trustees after the assignment, an order will be made to pay them over to the said Scholl. Louis J. Dolle, attorney.

### Money Left With the Bank, but Not Deposited—Trust Relation.

The petition of Peter Fox and the agreed statement of facts submitted therewith shows the following state of facts: About 2:25 o'clock p. m. on the day the Commercial Bank failed, Fox went to the bank to make a deposit of, as he supposed, $420 in money and a check for $70 on a bank in Shelbyville, Indiana. When the teller of the bank counted the money he found the cash $100 short, there being $320 instead of $420 as shown by the deposit slip. He so informed Mr. Fox, then recounted the money with the same result, then called the paying teller, who counted the money and also found the amount to be $320. Fox then said to the teller "That won't do, Harry, put that money to one side until I go back and see my bookkeeper" (who had prepared the deposit). To which the teller responded, "All right." Fox then left the bank and returned in a short time, but in the meantime the bank had closed its doors. The instructions of Fox to the teller to lay the money aside was disregarded, and it was mingled with the other funds of the bank. This case differs from the cases herein before considered, where deposits of money were made, in this, that in those cases the parties intended to confer the title to the money deposited on the bank, while in this case directly the contrary appears. The instructions of Fox to the teller to lay the money aside, and his response, "all right," established a fiduciary relation between Fox and the bank as to this particular money, and it was to be held for further instructions from Fox. Therefore, if the money came into the hands

of the assignee or trustees, it will have been received by them impressed with a trust in favor of Fox, and in such case it is not required that the owner should point out the very bills or coin deposited. Jones v. Kilbreth, 49 Ohio St. 401, 403; Commercial Bank v. Armstrong, 39 Fed. Rep. 684. The agreed facts show that Fox arrived at the bank about 2.25 p. m. The money was counted by the teller, then recounted, then the paying teller was called and he counted the money, so that several minutes were necessarily consumed in the counting and the natural dispute over the count, so that it must have been very near 2.30 p. m., the time when the bank closed, when Fox left the bank. Then, in view of the instructions given by Fox to the receiving teller to lay the money aside, it is extremely improbable that he would immediately hand the money to the paying teller to be paid out. I think it has been sufficiently shown that the money remained in the bank and went into the possession of the assignee among the other funds of the bank. An order will be made that the $320 and $70 proceeds of checks, be repaid to Mr. Fox. Symmes & Fox, attorneys.

### Set-off Allowed.

The petition of Joel Kennedy asks to have a deposit of $61 in the Commercial Bank set off against a note for $100 made to the bank by his wife, and indorsed by him, and discounted by the bank, he offering to pay the difference. The facts are these: On March —, 1895, Kennedy, who was a customer of the bank, went to the bank and asked the cashier if he would discount his note for $100. The cashier asked him if he had property. He answered that he had a homestead in the name of his wife. The cashier told him to get his wife to sign a note and bring it in. He got his wife to sign a note for that amount to the bank, he indorsed it, and the bank discounted and placed the money to his credit. It is clear that the note was put in this form at the request of the cashier to raise money for Kennedy. The proceeds went to his credit, and the debt is his. I think the set-off should be allowed. H. A. Sutton, attorney.

### Set-off Claimed Against a Note After it Has Been Paid in Full.

The petition of the Mt. Vernon Banking Company of Mt. Vernon, Indiana, shows the following state of facts: At the time of the assignment of the Commercial Bank, the Mt. Vernon Banking Company had on deposit with said bank $1,931.98. At the same time the Commercial Bank held the note of the Mt. Vernon Banking Company for $2,500, due and payable April 11, 1895. On April 1, the Mr. Vernon Banking Company notified the trustees of Commercial Bank by mail to make a set-off of its balance in bank against the note, and that it would pay the balance of $568.02. Not hearing from the trustees, the Mt. Vernon Banking Company paid its note at maturity. It now seeks to have the $1,931.98 refunded to it on the ground that it should have been set-off as against its note. These obligations were entirely distinct and independent of each other. Had the bank stood on its right of set-off, it no doubt would have been allowed, but, without making further inquiry than above stated, it elected to pay its obligation. In United States Bung Manufacturing Company v. Armstrong, 34 Fed. Rep. 94, in a case almost parallel with this one, Judge Jackson, in deciding the case, uses this language: "If the complainant had intended to rely upon its debt against the Fidelity National Bank as a set-off against its note, it should have declined payment of the note, stood suit thereon and set up its counter-claim as a set-off. This was not done, but it paid its note voluntarily and now invokes the aid of this court to enforce what is called its 'equitable right of set-off.' The facts presented by the bill do not raise any such equitable right."

The above language is equally applicable in this case, and the prayer of the petition will be denied.   Morrow & Oldham, attorneys.

### Judge Baker's Ruling Distinguished from the Rulings Above.

In conclusion, I desire to say that I have been referred to two cases decided by Judge Baker, of the U. S. Circuit Court at Indianapolis, one reported in 59 Fed. Rep. 235, and the other in 65 Fed. Rep. 690, in which it was held that where money was deposited in an insolvent bank just prior to the appointment of a receiver, and although the money might be mingled with other funds of the bank, yet if it could be shown that the money was included in the bulk of the moneys that came into the hands of the receiver, the depositor might recover it back in its substituted form.

While I think the decided weight of authority is in favor of the rule, that in case of the insolvency of a bank an ordinary deposit, not impressed with any trust, as between the bank and the depositor, can not be recovered back unless the original money deposited can be identified; yet, as none of the cases for the recovery of ordinary deposits, here decided, come within the rule laid down by Judge Baker, for the reason that, in no case has the money been satisfactorily traced into the hands of the trustees, I have, in nearly every instance, called attention to the fact in this opinion.

Charles W. Baker, Swing & Morse and Mallon, Coffey & Mallon, represented the trustees of the bank.