53    67
o55   463

UNITED STATES NATIONAL BANK OF OMAHA v. J. H. GEER ET AL.*

FILED DECEMBER 9, 1897. No. 7607.

1. **Negotiable Instruments:** INDORSEMENT: TITLE: INTENT. The question whether title passes to a negotiable instrument delivered to a bank under a restrictive but ambiguous indorsement, without an

---

*Rehearing allowed.

express contract, but in pursuance of an established usage, is one of fact rather than law, and depends on the intent of the parties.

2. ———: ———: Form: Parol Evidence. As between the immediate parties the form of an indorsement is not conclusive, but the nature of the contract may be proved by parol evidence.

3. ———: Sale: Bailment. Evidence examined, and *held* to show a sale of the instrument in controversy, and not a bailment for collection.

4. Sales: Fraud: Rescission: Banks: Insolvency. The right to rescind a sale for fraud is lost if not exercised before the vendee transfers the property to an innocent purchaser for value. This rule applies to an attempt to recover a chose in action sold to an insolvent bank in ignorance of its insolvency, as against the claims of a transferee from the bank who has parted with value on the faith of the bank's title.

Error from the district court of Nuckolls county. Tried below before Hastings, J. *Reversed.*

*J. C. Cowin* and *W. D. McHugh,* for plaintiff in error.

References: *Metropolitan Nat. Bank v. Loyd,* 25 Hun [N. Y.] 101, 90 N. Y. 530; *First Nat. Bank of Elkhart v. Armstrong,* 39 Fed. Rep. 231; *Cragie v. Hadley,* 99 N. Y. 131; *Ayers v. Farmers & Merchants Bank,* 79 Mo. 421; *Wasson v. Lamb,* 120 Ind. 514; *Titus v. Mechanics Nat. Bank,* 35 N. J. Law 588; *Strong v. King,* 35 Ill. 1; *In re State Bank,* 56 Minn. 119; *Holmes v. First Nat. Bank of Lincoln,* 38 Neb. 326.

*O. H. Scott* and *Cobb & Harvey, contra.*

References: *National Bank v. Burkhart,* 100 U. S. 692; *Barnard v. Kellogg,* 10 Wall. [U. S.] 390; *Beal v. City of Somerville,* 50 Fed. Rep. 650; *Manufacturers Nat. Bank v. Continental Bank,* 148 Mass. 553; *St. Louis & S. F. R. Co. v. Johnston,* 133 U. S. 566; *Moors v. Goddard,* 147 Mass. 288; *Fifth Nat. Bank v. Armstrong,* 40 Fed. Rep. 46; *St. Louis & S. F. R. Co. v. Johnston,* 27 Fed. Rep. 243, 133 U. S. 566; *Hoffman v. First Nat. Bank of Jersey City,* 46 N. J. Law 605; *Levi v. National Bank of Missouri,* 5 Dill. [U. S.] 107; *Balbach v. Frelinghuysen,* 15 Fed. Rep. 683; *Branch*

*v. United States Nat. Bank,* 50 Neb. 470; *First Nat. Bank of Chicago v. Reno County Bank,* 3 Fed. Rep. 257; *Freeman's Nat. Bank v. National Tube Works Co.,* 151 Mass. 413; *Blaine v. Bourne,* 11 R. I. 119; *City Bank of Sherman v. Weiss,* 67 Tex. 331; *White v. Miners Nat. Bank,* 102 U. S. 659; *Peck v. First Nat. Bank,* 43 Fed. Rep. 357.

IRVINE, C.

This was an action by the United States National Bank of Omaha to recover the amount of a certificate of deposit for $5,500 issued by the defendants Geer and Mease, partners in the banking business at Nelson under the name of the Commercial Bank, to the order of the defendant Craven, by him indorsed and transferred to the defendant the First National Bank of Hebron. It is claimed by the plaintiff that the certificate was by the Hebron bank sold and transferred to the Capital National Bank of Lincoln and by the Lincoln bank to the plaintiff. The Hebron bank, by its answer, asserts ownership in itself, claiming that the Lincoln bank received the certificate merely as the agent of the Hebron bank, for the purpose of collection, and that the indorsement being restrictive, the Lincoln bank could not and did not pass title to the Omaha bank. The right to the certificate as between these two parties is the only matter in contest, there being no issues affecting the other defendants except such as may be incidental to the controversy indicated. The district court found in favor of the Hebron bank and entered judgment accordingly.

Similar questions have been presented to the courts with such frequency and such variety of detail that there now appear in the books an array of opinions which would be hopelessly confusing were they to be considered as tending to establish general rules of law for determining such questions. They range all the way from those holding that, as between the parties even, title passes by the legal import of words used by way of indorsement, regardless of intent, to those practically resting the mat-

ter on the presumed motive of the indorser, disregarding entirely the form of the transaction and the contractual intent. While intermediate to these extremes are found many cases presenting marked resemblances to that before us, and solved in different ways by different courts, we are saved the necessity of an analysis of such cases for the purpose of inducing therefrom a general rule of law, by attention to a very simple proposition recognized in effect by counsel on both sides. A moment's reflection will show that the question is not what legal relations result from a deposit for collection alone, or from a sale or discount, but it is whether this was such a deposit or a sale; that is, whether title passed. The solution of this question rests in determining the common intent of the parties,—a question of fact and not of law. Among the cases expressly or by clear implication treating the question as one of fact are *Metropolitan Nat. Bank v. Loyd*, 25 Hun [N. Y.] 101, 90 N. Y. 530; *Titus v. Mechanics Nat. Bank*, 35 N. J. Law 589; *In re State Bank*, 56 Minn. 119; *Fifth Nat. Bank v. Armstrong*, 40 Fed. Rep. 46; *St. Louis & S. F. R. Co. v. Johnston*, 133 U. S. 566.

There is no conflict in the evidence. Such doubts as exist arise as to inferences from facts proved, and not as to the existence of those facts. For ten years preceding the events in controversy the Hebron bank and the Lincoln bank had a continuous course of dealings with one another, the Hebron bank keeping an account with the Lincoln bank, and remitting to it from time to time drafts, checks, and other instruments, which were either at once or upon collection placed to the credit of the Hebron bank. It is said that the banks were not "correspondents," but, so far as the evidence discloses, the only difference between their relations and those of banks confessedly occupying the relation in contemplation by witnesses who use that somewhat ambiguous term was that while the Hebron bank drew drafts for general banking purposes upon its correspondents at Omaha, and eastern cities, it drew against its credit at the Lincoln

bank only for the purpose of transferring funds to its so-called correspondents, and not in favor of its customers generally. So far as the treatment of paper sent by the Hebron bank was concerned, there was no difference between its relations with the Lincoln bank and with its Omaha correspondent. We mention this fact merely because in argument some stress seems to be laid on the supposed difference in relations. There is no room for doubt that the motive which influenced the Hebron bank to maintain the account at Lincoln was to secure an economical method of collecting its "foreign paper," or, more accurately, to secure an economical and speedy method of realizing cash, or a credit equivalent thereto, upon such paper. The motive of the Lincoln bank appears only by inference. It collected paper at par, except where it was itself subjected to expense in favor of third parties, and then charged against the paper only the expense so incurred. It paid the Hebron bank interest on daily balances. It seems quite clear that its motive, therefore, was to obtain the temporary use of the property of the Hebron bank so entrusted to it, for banking purposes. Paper remitted was divided into two classes, styled by most of the witnesses "cash items" and "collections," by officers of the Hebron bank as "sight items" and "time items." It is certain, however, that the latter nomenclature was inaccurate, as the distinction was only partly based on the time of payment. In the "cash items" were included all instruments presently payable on solvent banks and between individuals of known solvency. Other paper belonged to the collection class. The classification was determined by the character of the paper and not by the form of indorsement or the terms of the transmitting letter. Thus the form of indorsement on both classes seems to have been "Pay to the order of R. C. Outcault, Cash., for account of First National Bank of Hebron, Nebr." In remitting, printed forms were used, bearing after the address the words "Enclosed please find for collection and ——." The blank was

usually filled with the abbreviation "Cr." All witnesses agree that the language so employed was not regarded as of any significance in determining the disposition of the paper. If the paper fell within the "collection" class it was noted on the Hebron bank's collection register as having been sent, and its number on that register was noted on the blank with which it was transmitted. On receipt by the Lincoln bank it was entered on the latter's collection register, and the Hebron bank was by mail notified that it had been received and would obtain "prompt attention." When collected it would be credited to the Hebron bank, and the latter notified of the fact. The Hebron bank would then charge its amount to the Lincoln bank. If the paper was a "cash item," the Hebron bank would charge it to the Lincoln bank at once on remitting it, the Lincoln bank would credit it to the Hebron bank immediately on its receipt, and notify the Hebron bank that it had been so credited. No further notice would be sent the Hebron bank unless the paper should be dishonored, in which event its amount would be charged to the Hebron bank and the latter so notified, the paper being returned. Interest was paid on the general balance, including as it did those cash items which had been credited upon their receipt but not yet collected. It would seem that by the custom of banks in such cases, when a credited item is dishonored, interest thereon is charged to the remitting bank from the time credit was given, and that the Lincoln bank was authorized by such custom to so treat the Hebron bank, but it would also seem that such right was never in fact exercised. During the period referred to certain notes of the Hebron bank were rediscounted by the Lincoln bank, and some of these not being paid at maturity, the Lincoln bank exercised, and the Hebron bank acknowledged, the right to immediately charge them back to the Hebron bank in the same manner as dishonored "cash items." The balance at any time to the credit of the Hebron bank was subject to be drawn upon, including that amount

representing credited but uncollected cash items.  The
officers of the Hebron bank testify that they habitually
refrained from so drawing until a reasonable time should
elapse for the collection of such items, and that they re-
garded the privilege of sooner drawing as an act of cour-
tesy and not a legal right; but there can be little doubt
that both banks regarded the apparent balance as an·
available fund and that abstention from drawing by the
Hebron bank, prior to the collection of items, was an act
of convenience or prudence on its part, rather than the
recognition by it that the apparent credit was premature.

On January 20, 1893, the Hebron bank, being then the
owner of the certificate of deposit in controversy, re-
mitted it with other items to the Lincoln bank.   It was
indorsed in the usual manner, "for account of" the
Hebron bank, and was transmitted as usual "for collec-
tion and credit."   It was treated by both banks as a
"cash item" in the manner above described.   On sending
it the Hebron bank charged it to the Lincoln bank, and
on receiving it the Lincoln bank credited it to the Hebron
bank and notified the latter of that fact.   It was received
by the Lincoln bank on the 21st and the same day trans-
mitted to the plaintiff, the Omaha bank, under substan-
tially similar circumstances, and in pursuance of similar
usages and a similar course of dealing.   The Lincoln
bank charged it to the Omaha bank and the latter cred-
ited it to the Lincoln bank.   On the morning of the 21st
the account of the Lincoln bank was overdrawn with
the Omaha bank some $1,900.   Including the amount of
the certificate, credits were that day given the Lincoln
bank amounting to over $18,000.   The Omaha bank that
day paid out on checks and drafts of the Lincoln bank
nearly $17,000.   It thus appears that the whole of the
credit obtained by the certificate was the same day ex-
hausted by payments actually made in favor of the Lin-
coln bank.   The Lincoln bank was hopelessly insolvent,
to the knowledge of its officers, and was closed on the
afternoon of the 21st, never to reopen.   On the 23d the

certificate was presented to the Nelson bank and payment refused because of the claim interposed by the Hebron bank. Perhaps certain other facts of which the court takes notice are of some import. Nelson, where the certificate was payable, is in the county adjoining that in which Hebron is located, to the west, and the two towns are connected by a line of railroad. Lincoln is a considerable distance to the northeastward of both towns, and Omaha is still farther northeast. It is not claimed that the diversion of paper from its natural geographical course is in itself any proof that it is being transmitted for other purposes than collection, but the fact that the Hebron bank found it profitable to send the paper through such a course indicates that the purpose of the Lincoln bank was to use the paper otherwise than as a direct collecting agent, and throws some light on the understanding of both parties as to what such use might be.

Certain aspects of the foregoing facts tend, it is argued, to stamp the transaction as one between a principal, the Hebron bank, and its agent for collection. One of these features is that the Lincoln bank was not what is known as a correspondent of the Hebron bank. As already indicated, we cannot conceive that any importance attached to this distinction, whatever it may be, because there can be no doubt that their arrangements contemplated the establishment of the relationship of debtor and creditor at one time or another, with reference to this particular instrument or its proceeds. Next it is argued that the arrangement between the banks was for a collection agency and that therefore the transaction should be treated in the nature of a collection. The motive of the Hebron bank in entering into its relations with the Lincoln bank was, as stated, undoubtedly to obtain the speedy conversion of foreign paper into cash or its equivalent, but, that this object was not intended to be effected by the specific collection and remission of each instrument forwarded, is attested by every transac-

tion between the two banks for a period of many years. It was probably immaterial to the Hebron bank whether it collected the paper through an agent for its own benefit, or in effect sold it and at once obtained credit therefor, and in any event the motive of the Hebron bank is not the controlling circumstance. It is perfectly clear that the real understanding between the banks was that the paper should become that of the Lincoln bank, to handle in its own way and for its own benefit, else we must suppose that it was acting in responsible business matters wholly gratuitously. Nor can we see that the practice and conceded right of the Lincoln bank, to charge back dishonored items, can be of any great weight in determining the nature of the contract. The Hebron bank was responsible as indorser on all such paper, and it seems to have been the practice of the Lincoln bank to take the necessary steps to charge the Hebron bank as such. That liability alone justified the Lincoln bank in charging back dishonored paper against any credit then existing. It is argued that the credit given on receipt of cash items was, because of such practice, provisional only and insufficient to bind either party; but it was so far absolute as to permit the Hebron bank to draw against such credit,—in other words, to enforce payment by the Lincoln bank,—and seems only to have been conditional in the sense that any purchase of negotiable paper is conditional when based on a responsible indorsement, and with the understanding that in case of dishonor the holder will look immediately to the indorser. Nor was the form of indorsement, under all the facts of the case, indicative of a transfer for collection merely. It is probably true, and we consider the case on this theory, that it was so restrictive as to charge the Omaha bank with notice of a reserved title in the indorser if title were reserved. But, whatever may be the law elsewhere, it is the law of this state that as between the immediate parties the true relationship may be shown, notwithstanding the form or terms of the indorsement itself.

(*Roberts v. Snow,* 27 Neb. 425; *Dusenbury v. Albright,* 31 Neb. 345; *Salisbury v. First Nat. Bank,* 37 Neb. 872; *Holmes v. First Nat. Bank,* 38 Neb. 326; *Corbett v. Fetzer,* 47 Neb. 269.) This being so, when we consider the uniform course of business between these parties, it seems that the real significance of the language of this indorsement was to pass the certificate, not for collection merely, but as the property of the Lincoln bank for the purpose of its amount going forthwith to the credit of the Hebron bank on the account kept therewith. The form of the transmitting letter certainly tends toward a remittance for collection, but in view of the admitted fact that all classes of paper were remitted under this same form and that they were differently treated under this same instruction, we cannot permit this fact to control the more emphatic language conveyed by the acts of the parties. Stress is also laid on a note appearing on the printed form whereon acknowledgments were made by the Lincoln bank of the receipt and credit of such items. This was as follows: "This bank, in receiving collections elsewhere than in Lincoln, acts as your agent, and assumes no responsibility beyond that of due diligence on its part." But this somewhat vague notice applies by its terms to "collections" only, and the blank bore upon it a separate column for collections, on which this certificate did not appear, this, like all "cash items" appearing in a column headed "credited." Thus the notice referred to made even more distinct the practical difference between the two classes of items and showed, if it showed anything, that the "cash items" were not received for collection. On the other hand, there are certain facts which to our mind unmistakably stamp the transaction as a sale, and none is inconsistent with that theory. That there were two classes of items the classification being based manifestly on the practicability of immediately converting the paper into cash, or using it as such, without subjecting it to a process of collection, and that this instrument was treated by both parties as belonging

to the cash class; that credit was immediately given before the Lincoln bank had disposed of the paper or collected its proceeds; that interest was paid upon this credit, and that it was subject to draft, all these facts point toward a sale. Mere book-keeping, it is true, does not control the question. Charges and credits may be made merely for convenience in book-keeping; but when the evidence shows that they were not so made, that they were not made at all with items confessedly held for collection, and that when made as to other items, such entries were accompanied by such results as the payment of interest and the honoring of drafts, the matter is no longer one of book-keeping, but is essential to the transaction itself. It is inconceivable that the Lincoln bank would collect gratuitously and pay interest on paper which it did not own, and before it was collected, for the privilege of performing this gratuitous service. It is absolutely certain that the Lincoln bank undertook such service, so advanced credit and paid interest, for the privilege of using the paper for its own purposes and its own profit, as it did in this case by selling it to the Omaha bank, and that the Hebron bank perfectly understood that this was the object and that such paper was so treated. In the light of the usage of the banks the contract was in effect this: The remittance by the Hebron bank was a proposal to sell the certificate for its face, the Lincoln bank to immediately place so much at the disposal of the Hebron bank and to pay interest thereon until the Hebron bank should demand the money or its equivalent; the Hebron bank assuming the ordinary liability of an indorser with the express understanding added thereto that such liability should be subject to immediate enforcement in case of dishonor, by charging the amount against the credit maintained in the Lincoln bank. The mailed acknowledgment was an acceptance of that proposal. No clearer case of a transfer of title could well be contrived. For reasons stated at the outset we do not consider cases

adjudicated elsewhere as of any force in determining the facts of this case, but it is believed that all the cases holding under somewhat similar circumstances that title did not pass, present such differences in the facts as to render them readily distinguishable. For instance, in what is perhaps the strongest case cited, *Beal v. City of Somerville,* 50 Fed. Rep. 647, there was no agreement, express or implied, that the checks deposited should be treated as cash or that the credit given might be drawn against. Interest was not paid. Other cases treat an indorsement "for collection" as controlling, and incapable of being extended by extrinsic evidence. Others neglect the fundamental rule that a deposit generally creates simply the relation of debtor and creditor, and is not a bailment.

It is suggested that as the Lincoln bank was at the time insolvent to the knowledge of its officers, it was incapable of taking and consequently transmitting title. This is stating the rule too strongly. The rule invoked is only the application of the general law of fraud in sales induced by false representations, keeping the bank open and holding it out as ready to transact business being an implied representation of solvency. A sale made to such a bank would not be void. It would be, at the most, voidable at the option of the vendor or depositor, and could not be avoided after the rights of innocent third parties had attached. As already intimated, the indorsement may have been so restricted that the Omaha bank could not claim as an innocent purchaser if title had not in fact passed to its vendor, but title did pass and the Lincoln bank owned the certificate unless and until the Hebron bank rescinded the sale. Before this happened it could, and did, pass title to a stranger who parted with value therefor, and it was then too late for the Hebron bank to assert its right to rescind.

REVERSED AND REMANDED.