[Civ. No. 11787.   Third Dist.   July 24, 1969.]

LYLE E. MEYER, Plaintiff and Respondent, v. FORD MOTOR COMPANY, Defendant and Appellant.

Downey, Brand, Seymour & Rohwer, Richard G. Worden, Harvey S. Kronfeld, David L. Creskoff and Robert Scott for Defendant and Appellant.

Julian Caplan and J. Thomas McCarthy for Defendant and Respondent.

BRAY, J.*—Defendant appeals from a judgment in favor of plaintiff for $53,500 compensatory and $100,000 punitive damages, and from an order denying its motion for judgment notwithstanding the verdict.

## QUESTIONS PRESENTED

1. Authority of Ford's agents to make promises.

2. No evidence that plaintiff justifiably relied on the alleged false promises.

3. Damage or injury resulting from reliance.

4. Measure of damages.

5. Inflammatory evidence and argument concerning two dealers (punitive damages).

## RECORD

Plaintiff seeks damages for the termination by defendant of his Ford agency at Elk Grove. The complaint is in four counts. The first count is for breach of written contract alleging that Ford terminated the sales agreement without cause, selecting Frank Cate as successor dealer in bad faith with intent to deprive plaintiff of his agency. The jury found for Ford on this count. Plaintiff did not appeal from that part of the judgment.

The second count is for breach of an oral agreement under which Ford undertook to assist plaintiff in selling the assets of the agency. The jury awarded plaintiff $53,500 on this count. Ford appeals from that part of the judgment thereon.

The third count is based on fraud, alleging that Ford made the oral agreement, upon which plaintiff relied, without intending to perform it. On this count the jury awarded plaintiff $53,500 compensatory damages and $100,000 punitive

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

damages. Ford appeals from that part of the judgment thereon.

The fourth count brings in Frank Cate as a defendant additional to Ford. It alleges that Ford selected Cate as dealer replacing plaintiff pursuant to an unlawful conspiracy to deprive plaintiff of the dealership. On this count Cate's motion for nonsuit as to him was granted and the jury found for Ford. Plaintiff did not appeal from that part of the judgment in favor of Cate and Ford on this count.[1]

We summarize the evidence in a light most favorable to plaintiff, the prevailing party. (3 Witkin, Cal. Procedure (1954) Appeal, § 84, pp. 2245-2246.) We begin by listing the names and job titles of the Ford personnel with whom plaintiff dealt.

*W. J. Cooper,* Ford's regional sales manager, responsible for its operations in 11 western states (including California) and in Hawaii and Alaska. His immediate superior was Ford's general sales manager back at its corporate headquarters in Dearborn, Michigan.

*J. A. King,* Ford's district sales manager in its San Jose district, which covered California from the Bakersfield area north into parts of Oregon, as well as western Nevada and the Hawaiian Islands. He was "top man" in the district. During the period involved in this case, King's district had about 174 franchised dealers, with average annual sales of 75,000 cars and 22,000 to 30,000 trucks. His immediate superior was Cooper.

*J. Rands,* assistant district sales manager, second in command to King in the San Jose district.

*J. Bonnell,* general field manager, third in command in the San Jose district.

*W. Avery,* market representation manager (also called dealer placement manager), in nominal "charge" of dealer placements and replacements in the San Jose district. However, he reported directly to King and King's approval was required on his recommendations.

In 1957 a standard Ford sales agreement was entered into between Ford and a partnership comprised of plaintiff and one Sperry. The agreement appointed the partnership Ford's dealer in Elk Grove and set forth in detail the rights, duties

---

[1]Ford's motion for a nonsuit as to the first three causes of action was denied as well as its motion for judgment notwithstanding the verdict. To avoid a double recovery of compensatory damages under the second and third counts, the trial court properly used the figure of $53,500 only once in computing the total principal amount of the judgment.

and obligations of the parties. It specifically exonerated Ford in certain matters. In paragraph 18 the partnership agreed that Ford had no obligation to assist the dealer in selling the dealership assets on the termination of the sales agreement and that Ford would not be responsible in any way in connection with such sale. The agreement provided that Ford had the sole right to appoint its dealers and that the partnership could not transfer ownership of the dealership to anyone without Ford's written consent. In 1961 the partnership was dissolved and with Ford's written consent plaintiff became Ford's sole dealer in Elk Grove.

Plaintiff's car and truck sales performance in the years 1958 through 1963 did not meet Ford's criteria. Repeatedly Ford in the years 1960 through 1963 pointed out the deficiencies and recommended ways of improvement and even placed plaintiff under an intensive dealer rehabilitation program from April to October 1960. Early in 1962 plaintiff began to think of selling and determined to do so at the end of the year. However, he did not sell.

In April 1963 King informed plaintiff that he intended to recommend to Cooper the termination of the agency and asked plaintiff to sign a letter of intent to resign. In order to avoid the preparation of a termination proceeding, and the time such proceeding took, and to be in a position to quickly appoint a replacement dealer, it was customary for Ford to ask the dealer being replaced to sign the type of letter presented to plaintiff. Plaintiff did not sign. Ford asked plaintiff on several occasions thereafter to do so. Plaintiff declined to sign a letter at all similar until December 4, 1963, and then under the circumstances hereinafter related, which caused this lawsuit.

In May 1963 King recommended to Ford that plaintiff's franchise be terminated. On November 1, 1963, plaintiff received from Ford's home office a written notice that, consistent with the termination provisions of his Ford sales agreement, his franchise would be terminated on January 31, 1964.[2]

Ford had established in Dearborn a Dealer Policy Board, whose purpose was to provide a forum where dealers could

[2]The evidence showing that plaintiff's sales performance had not met Ford's criteria is not in issue on this appeal. In finding in Ford's favor on count 1 (breach of contract in terminating the agreement without cause) the jury impliedly found that Ford terminated the contract in good faith because of plaintiff's substandard sales record.

contest their impending terminations. The board was completely independent of the operating divisions of the Ford Motor Company. In an appropriate case, it could overrule the district, regional and home office sales hierarchy. The termination notice sent plaintiff advised him that if he timely requested a conference at Dearborn with the board, and if such conference were held and the board confirmed his termination, it would not be effective until 90 days after receipt of notice from the board of such confirmation. The notice cautioned him that if he failed to request a conference or to attend a scheduled one the January 31 termination date would continue to apply.

On November 15, 1963, plaintiff wrote the board asking for a conference. The board scheduled a date which, at plaintiff's request, was postponed until December 18. On December 3 plaintiff phoned Rands, whom he had known for many years and considered a friend, and requested a meeting to discuss finding a buyer for his dealership. On December 4 plaintiff met with Rands, Bonnell and Avery. Plaintiff asked Rands, who had learned from Dearborn of the scheduled hearing at the policy board, if he thought it would do plaintiff any good to present his case to the board. Rands replied that it would not, that it was not necessary for him to meet with the board inasmuch as (1) Ford would assist him in finding a buyer; (2) the buyer would be satisfactory not only to Ford but to plaintiff as well; (3) the final sales price would be determined by plaintiff and the buyer without interference from Ford; and (4) plaintiff would not be hurt financially on the sale, and the sales price would be sufficient to satisfy his existing indebtedness.[3] These are the representations upon which plaintiff bases his claim herein. Bonnell and Avery joined Rands in making these promises. Plaintiff then agreed that he would not attend the board meeting,[4] and because of the above

---

[3]Plaintiff did not sue Ford as an indemnitor against loss.

[4]The reporter's transcript of plaintiff's testimony shows:

[Page 158]: "Q . . . I asked you whether you said anything to them about going back to the dealer policy board; did you make any commitment about that?

"A. Yes.

"Q. What did you say?

"A. Mr. Rands told me that, in his opinion, that it would be of no value for me to go to Detroit [sic], talk to the dealer policy board; and so I stated that I would not go back and that I would write a letter to that effect, telling the dealer policy board that I would not attend the meeting."

[Page 435]: "Q. Let us consider again the December 4th meeting, is it your testimony that you agreed at that December 4th meeting not to

promises, and at Rands' request, he signed a letter addressed to Ford's San Jose office captioned "Request for Assistance in Selling," which was a letter similar to the one which on several occasions theretofore he had refused to sign. The letter advised Ford of plaintiff's desire to sell the assets of his dealership and requested Ford's aid in finding prospective buyers. It recognized Ford's "right to decline" in its discretion to enter into a sales agreement "with anyone" who might be willing to purchase plaintiff's assets. The letter was a customary one required by Ford before it would refer prospective buyers to a dealer. Its purpose was to protect Ford against liability for circulating information about a dealer's desire to sell. Ford considered such a letter to be a conditional resignation of a dealership which would become final upon the sale of an existing dealer's assets to a successor approved by Ford. In Ford's view, the letter was advantageous in that it simplified termination and expedited dealer replacement. At the suggestion of the Dearborn office, Rands added to the letter a proviso stating that the letter did not affect the pending termination proceedings.[5]

On the termination of the December 4 meeting, Avery talked to plaintiff alone and told him that the maximum sales price he, as dealer placement manager, would approve was $25,000. Plaintiff told Avery that Avery's superiors had told plaintiff otherwise. Plaintiff was "shocked" at Avery's statement in view of what had just occurred at the December 4 meeting. Plaintiff had told the district personnel as early as the July meeting (fn. 5, *supra*) that he had put at least $55,000 into the dealership, and he had insisted at that time that the proceeds of any sale be sufficient to satisfy his business indebtedness. At a meeting with Bonnell in October (fn. 5, *supra*) plaintiff told him that he was asking $65,000 for his

go to the Dealer Policy Board, not to appear before that board?
"A. Did I agree? Yes."

[5] At an earlier meeting, July 9, 1963, held in Sacramento to review plaintiff's sales deficiencies and to inform him that the San Jose district and the Western Region had recommended to Dearborn termination of plaintiff's agency, the same four promises above set forth had been made to plaintiff by Cooper. King and Bonnell were present and did not express disagreement with Cooper's assurances. Plaintiff again refused at that time to sign the letter Ford theretofore had requested that he sign. On October 3, 1963, Bonnell repeated the first three promises hereinbefore set forth. Plaintiff was still unwilling to sign the letter. As early as December 1962, Bonnell, King and Avery had promised plaintiff that they would help him to sell and that Ford would see to it that plaintiff would not lose any money on his investment.

dealership ($31,000 for parts, inventories, fixtures and equipment, plus $34,000 to pay off the bank on a dealership loan), and that a sales price of less than $65,000 would lead plaintiff to bankruptcy.

Immediately plaintiff went into Rands' office to see him but he was gone. Bonnell had left the building. Plaintiff left word for King and Rands to phone him, to no avail. During the next two or three days he was unsuccessful in attempts to reach Rands and King by phone.

In spite of Avery's statement to him, plaintiff on December 11 wrote to the board cancelling the December 18 conference, stating that he had signed the request for assistance in selling, had talked to Rands and felt that it was no longer necessary to meet with the board

On this appeal Ford does not attack the sufficiency of the evidence which showed that the four promises mentioned above were each willfully fraudulent in that, at the time they were made, Ford's agents had no intention of performing them. King admitted on the stand that, when Cooper was making those promises on July 9 (fn. 5, *supra*), King did not mention a reservation in his mind that the sales price would be subject to his approval. At trial Ford's representatives took the position that Ford had a right to control the sales price by insisting that it be determined strictly on an inventory and appraisal basis, since in their view anything above that would reflect a sale of the franchise itself, which was solely Ford's property and not for sale. Cooper and Avery testified that the inventory and appraisal method was customary with Ford, and Cooper acknowledged that he had it specifically in mind while he was talking to plaintiff at the July 9 meeting. However, plaintiff testified that his December 4 private meeting with Avery was the first time the inventory and appraisal approach was mentioned. Valuation by this method would have resulted in a sales price far short of plaintiff's $65,000 requirement. On January 2, 1964—at a meeting in Sacramento between plaintiff, Avery and Cate—Avery told plaintiff that no one else would succeed to the dealership except Cate, that the inventory and appraisal method must be used, that he (Avery) would not let the dealership be sold for over $25,000, and that plaintiff must sell to Cate on those terms or be terminated (an event which the district personnel knew would occur on January 31 absent a prior sale). When plaintiff left the January 2 meeting, he phoned King and learned from him for the first time that King fully backed

Avery and that King required him to sell to Cate on Avery's terms or be terminated. King admitted on the stand that Cate was his choice. During January King rejected a dealership application from a well capitalized group ("Wong-Fong-Pearce") which included eminently successful businessmen as well as a member long experienced in responsible automobile sales positions. On December 18 that group had made plaintiff a $65,000 offer, subject to Ford's approval. In mid-January another potential buyer ("Prestell"), who was general manager and operator of a Sacramento automobile firm, also offered plaintiff $65,000. When plaintiff phoned San Jose about him toward the end of January, Avery simply reaffirmed what he had said before and added that "he was doing just exactly what he was told to do" and that plaintiff might as well accept it. Rands also told him at that time that "they have made up their mind on Frank Cate and that was it."

Unwilling to sell to Cate under the conditions imposed by King and Avery, plaintiff was forced to close his doors upon expiration of the franchise January 31. Ford subsequently appointed Cate its dealer in Elk Grove. The bank foreclosed on its unpaid loan to plaintiff, and his tangible assets were liquidated at forced sale.

1. *Authority of Ford's agents.*

The parties were in agreement at trial that Cooper, King, Rands, Bonnell and Avery had *actual* authority to promise plaintiff that (1) Ford would assist him in finding a buyer, (2) the buyer would be satisfactory not only to Ford but to plaintiff as well, and (3) the final sales price would be determined by plaintiff and the buyer without interference from Ford. On appeal Ford claims there was no evidence that any of those agents had either actual or ostensible authority to also promise plaintiff that (4) he would not be hurt financially on the sale and the sales price would be sufficient to satisfy his existing indebtedness. Mr. Barcley, Ford's market representation manager from Dearborn, testified that those agents had no actual authority to give such a "guarantee." (See fn. 3, *supra*).

". . . Actual authority stems from conduct of the principal which causes the agent reasonably to believe that the principal has consented to the agent's act; ostensible authority, from conduct of the principal which leads the third party reasonably to believe that the agent is authorized to bind the

principal." (*Mannion* v. *Campbell Soup Co.* (1966) 243 Cal. App.2d 317, 320 [52 Cal.Rptr. 246].) ▪ Although it is established that ostensible authority can be created only by the acts or declarations of the principal, not by those of the agent (*Dickens* v. *Bunker* (1959) 169 Cal.App.2d 383, 388 [337 P.2d 489]), the principal need not have been in direct contact with the third party; the manifestation of the principal may be to the community at large, and may consist of appointing the agent to a particular position. (See Rest. 2d Agency, § 8, p. 31, and § 27, pp. 103-104.) ▪ "[W]here . . . an agent is by his principal put in charge of a business as the apparent manager thereof, he is clothed with apparent authority to do all things that are *essential to the ordinary conduct of such business* at that place, and third persons, acting in good faith, and without notice of or reason to suspect any limitations on his authority, are entitled to rely on such appearance. . . ." (*Henry Cowell etc. Co.* v. *Santa Cruz etc. Bank* (1927) 82 Cal.App. 519, 524 [255 P. 881].) (Italics ours.) ▪ "The theory of ostensible agency is that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person, the transaction seems regular on its face and the agent appears to be acting *in the ordinary course of the business confided to him.*" (*Walsh* v. *Hooker & Fay* (1963) 212 Cal.App.2d 450, 456 [28 Cal.Rptr. 16].) (Italics ours.)

▪ Although "the issue of ostensible authority is a question of fact" (*Barclay Kitchen, Inc.* v. *California Bank* (1962) 208 Cal.App.2d 347, 353 [25 Cal.Rptr. 383]), such a characterization gives no meaningful guidelines to the third party who must gauge whether the agent's words or deeds in fact typify the "ordinary" conduct of the business. This is especially so where, as here, the principal is a distant, prestige corporation which carries on massive activities in the third party's geographic area. In that event, viewed realistically, the third party may well consider the corporation *as being* headquartered in his zone, and he may reasonably consider its local executives *as being* the corporation, especially when their titles and functions indicate to him that they are high in the corporate hierarchy. (Cf. *Crawford* v. *County of Sacramento* (1966) 239 Cal.App.2d 791, 800 [49 Cal.Rptr. 115].) The very prestige of the corporate name may heighten the third party's confidence in the regional or district executives through whom, for all practical purposes, the third party must necessarily deal.

Actually the fourth promise (that plaintiff would not be hurt financially, and the sales price would be sufficient to satisfy his existing indebtedness) is only a slight amplification of the third promise (that the final price would be determined by plaintiff and the buyer without interference from Ford). Ford concedes its agents had authority to make the third promise. Obviously, if the sales price is to be determined by plaintiff and the buyer, plaintiff is not going to sell at a price that would not take care of his existing indebtedness, if it is at all possible to find a buyer willing to pay plaintiff's price. ■ "A promise to do something necessarily implies the intention to perform, and, where such intention is absent, there is an implied misrepresentation of fact, which is actionable fraud." (*Harazim* v. *Lynam* (1968) 267 Cal.App.2d 127, 133 [72 Cal.Rptr. 670].)

■ The circumstances of this case were such as to constitute a holding out to plaintiff that Ford's agents had authority to make all the promises. The fourth promise of Cooper and the San Jose district personnel was clearly made during their prosecution of a matter ordinarily entrusted to them by Ford—the obtaining of a signed "Request for Assistance in Selling." Substantial evidence showed that this fourth promise was made for the direct purpose of producing that result, an object of benefit to, and desired by, Ford. Hence, the promise was unquestionably within the scope of the agents' ostensible authority. Indeed, since Cooper, King, Rands, Bonnell and Avery had actual authority to promise plaintiff that the final sales price would be determined by him and the buyer, and that the buyer would be one satisfactory to him, it does not now lie with Ford to claim that it could not reasonably have anticipated its agents would make the fourth promise. The satisfaction of existing business indebtedness is ordinarily a prime factor in a seller's determination of an adequate sales price, and obviously a potential buyer who cannot or will not meet that price is not one who is satisfactory to him.

■ Ford also points to paragraph "E" of the preamble of plaintiff's franchise, which provided that no one except certain designated officers or *general* managers of Ford was authorized "to make or execute any other agreement relating to *the subject matter hereof* on behalf of the Company, or in any manner to enlarge, vary or modify *the terms of this agreement*. . . ." (Italics ours.) The answer to that contention is twofold: *First*, unlike the subject of *termination*, the furnishing by Ford of prospective buyers to an existing

dealer, pursuant to a "Request for Assistance in Selling" (a practice conceded to be actually authorized by Ford itself), was neither a "subject matter" nor one of "the terms" of the franchise agreement. Hence the written limitation of paragraph "E" was not literally applicable. *Second,* since Cooper and the district personnel gave the fourth promise within the scope of their ostensible authority, their act was in law *the act of Ford itself,* and the limitation of paragraph "E" was satisfied. (Civ. Code, § 2330.)

As to Ford's contention that there was no ostensible authority because the franchise reserved to Ford the right to decline to appoint as an authorized dealer any person who might have sought or agreed to purchase the assets of an existing dealer, there are two reasons why that argument is of no avail. *First,* by its very terms, that reservation of rights only applied "in the event this sales agreement *shall have been terminated or shall have expired.* . . ." (Italics ours.) Consequently, the reservation simply did not apply to the conduct of Ford's agents, or to the relationship of the parties, prior to January 31, 1964. *Second,* since the acts of its agents within their ostensible authority were in law the acts of Ford, Ford thereby waived the reservation of rights. The promises made to plaintiff clearly implied that Ford would not insist on a unilateral right of selection to the exclusion of *every other* prospective purchaser except Cate. "[I]n every contract there exists an implied covenant of good faith and fair dealing." (*Universal Sales Corp.* v. *California etc. Mfg. Co.* (1942) 20 Cal.2d 751, 771 [128 P.2d 665].)

### 2. *Justifiable reliance.*

Ford points to plaintiff's testimony that immediately at the conclusion of the meeting with Rands, Avery and Bonnell (where the representations were made upon which this action is based), Avery told plaintiff that he would not approve a sale of plaintiff's assets for more than $25,000. It is interesting to note that at trial Avery denied making such a statement. However, plaintiff's belief that he did make it requires an evaluation of its effect on the question of plaintiff's right to rely upon the promises of the four at the meeting which preceded it. Ford contends that, because of plaintiff's testimony that Avery made that statement to him, plaintiff had no right to rely upon the statements made in the meeting. Ford also contends that the fact that plaintiff thereafter cancelled his scheduled meeting with the board indicates that he did not rely on the statements of the four.

On the contrary, it would appear that he did rely upon them in spite of Avery's later statement, or otherwise he would not have cancelled his appearence before the board.

Whether plaintiff justifiably relied upon false promises is generally a question of fact. (*Lerner* v. *Riverside Citrus Assn.* (1953) 115 Cal.App.2d 544, 549 [252 P.2d 744].)

". . . Negligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather than negligent. . . . The fact that an investigation would have revealed the falsity of the misrepresentation will not alone bar his recovery. . . . If the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable, however, he will be denied a recovery." (*Seeger* v. *Odell* (1941) 18 Cal.2d 409, 414-415 [115 P.2d 977, 136 A.L.R. 1291].)

In view of the superior positions in the Ford hierarchy of the other promisors, it cannot be said as a matter of law that it was unreasonable for plaintiff to assume that Avery was merely speaking for himself and that, in keeping with their promises, the others would overrule anything to the contrary which Avery might do. "The law does not require that a person must assume that everyone with whom he has a business transaction is a rogue and act accordingly." (*Stallman* v. *Schwartz* (1946) 76 Cal.App.2d 406, 411 [173 P.2d 388].) Moreover, plaintiff had in mind that when he bought out his former partner, Sperry, the same Ford executives who made their promises to him saw that Sperry was handsomely paid for his interest. Plaintiff was not unreasonable in expecting similar treatment.

Whether the Ford agents other than Avery meant what they said could be known only by them. "The right to rely on representations is generally conceded where the hearer lacks equal facilities for ascertaining the truth, as where the facts are peculiarly within the knowledge of the speaker and are difficult for the hearer to ascertain . . . , or where from the circumstances attending the transaction the hearer is compelled to rely on the speaker's statements." (37 C.J.S., Fraud, § 34, pp. 279-280.) As said in *Sime* v. *Malouf* (1949) 95 Cal.App.2d 82, 107 [212 P.2d 946, 213 P.2d 788], "[p]laintiff could not fairly have been charged with notice of facts which he could have learned only out of the mouths of the conspirators. . . ."

### 3. *Damage or injury resulting from reliance.*

Defendant contends 'that plaintiff was not damaged or injured by the false representations. Defendant points out that section 1709 of the Civil Code provides, "One who willfully deceives another with intent to induce him to *alter his position to his injury or risk,* is liable for any damage which he *thereby* suffers." (Italics ours.) Defendant urges that plaintiff did not alter his position to his injury as a result of the promises because plaintiff, after the meeting of December 4, still owned the dealership and its assets.

Because of the promises, plaintiff cancelled the policy board conference scheduled for December 18. (See fn. 4, *supra.*) Ford's termination notice had warned him that his failure to attend a scheduled conference would result in continued application of the January 31 termination date. There was no evidence that plaintiff was informed at any time of any possibility that he might still present his case to the board despite his cancellation of the meeting. Had he gone to the board on December 18, he would have had automatically, under the board's procedure, 90 days from notice of its decision before his dealership would have terminated. This would have given him at least until the middle of March and probably longer, depending upon how quickly the board decided his case and notified him of its decision. During this time his dealership would be a going concern much easier to sell and having a greater value than one which became defunct on January 31. Barcley testified that the board might even have extended the termination deadline if the dealer was having difficulty in arriving at a successful bargain with a prospective purchaser. At the December 4 meeting no mention was made to plaintiff that if he went back to the Dealer Policy Board he might obtain time, beyond even the 90 days, before which his termination would become effective, and there was no evidence that he otherwise knew of such a possibility.

Therefore, by cancelling his December 18 appointment under inducement of the December 4 promises, what plaintiff gave up was a *minimum* of six extra weeks of life on his franchise (from the end of January to mid-March). The evidence clearly showed that a going business has a greater sales value than a terminated one. By agreeing, in effect, to allow the January 31 termination to go through, plaintiff ran no risk as long as Ford's agents kept their promises. Even though on December 4 he could not be sure that he would be able to sell

his dealership before January 31, after which his dealership would no longer possess the more valuable characteristic of a going business, plaintiff could not be hurt after January 31 if Ford honored its promises then because, among other things, its agents had assured him that he would be free to seek a sales price which would be adequate to satisfy his indebtedness.

It avails Ford nothing to urge that "there is no evidence that Ford would have approved a sale of Meyer's assets for substantially more than their appraised fair value assuming, *arguendo*, that the Board would have extended the time of Meyer's termination." That argument presupposes that Ford had a right to countermand the sales price—a concept which the promises of December 4 had expressly repudiated.

The fact of the separate $65,000 valuations by Wong-Fong-Pearce and Prestell was substantial evidence that, as a going business, plaintiff's dealership could command that price. In fact, as early as October 1963, Cate himself and one of Cate's prospective dealership associates (Baron) had each said the $65,000 figure was fair. These circumstances were also evidence that, if plaintiff had kept and not cancelled his December 18 appointment (in which event his termination would have been deferred by board action till mid-March or beyond), and if Ford had exercised in good faith its sales agreement right of prior approval of the assignment of *existing* franchises, plaintiff would have been able to sell his dealership as a going business to *someone* before the delayed termination date. Ford offered no evidence to the contrary.

Instead, after plaintiff had cancelled his Dealer Policy Board conference, Ford's agents pursued a Cate-only, $25,000-only approach. The result was that plaintiff found himself on January 31 with a dealership that had lost its $65,000 value because it no longer was a going business. Thus, by virtue of plaintiff's reliance on Ford's promises, his damages were incurred on January 31. The intransigence of its agents clearly showed that Ford did not intend to honor its promises at any time, either before *or after* January 31. As indicated above, plaintiff produced substantial evidence that, if Ford had acted in good faith, *some* buyer mutually acceptable to Ford and plaintiff would have been found reasonably soon after January 31. In such event, as a practical matter, Ford's promises of December 4 would have resulted in the dealership being treated as a going business for sale price purposes, despite the technical termination at the end of January.

Cate used the January 31 termination date as an effective bargaining tool to cut down the price he was willing to pay plaintiff. With a "stalemate" between Cate and plaintiff, plaintiff would have had additional time to convince Ford to agree to a sale to either Wong or Prestell, both of whom had offered plaintiff $65,000, or to find another who would be will-. ing to pay his price. King admitted that when, on January 31, plaintiff was forced by Ford to close his business, the prospect of a fair price was gone.

4. *Measure of damages.*

Ford claims that, "over Ford's objections and requested instructions to the contrary . . . , the jury was permitted to use and did use the benefit of the bargain measure of damages in the third [fraud] count. . . ," and that this was "clearly erroneous under California law." Ford urges that the court should have limited the jury to an award of "traditional 'out-of-pocket' damages for the alleged fraud."

Ford's claim is unfounded because the record shows that Ford made *no* objections to the evidence concerning damages and requested *no* instructions concerning the measure the jury was to apply in assessing damages. (Cal. Rules of Court, rule 52.) A party may not complain of a failure to instruct on the measure of damages where he did not propose such an instruction. (*Nelson* v. *Marks* (1954) 126 Cal.App. 2d 261, 270-271 [271 P.2d 900].)

An examination of defendant's "Memorandum of Points and Authorities in Support of Motion for New Trial" and oral argument thereon shows that at no time was defendant claiming that the proper measure of damages in the case was the "out-of-pocket" rule. Indeed, at that oral argument counsel for defendant specifically told the court, "Now, whether or not the plaintiff's or the defendant's rule of damages is correct or not, *we think is immaterial.* . . . We have, and . perhaps unfortunately, used the phrase 'out of pocket damages' or 'out of pocket loss'. I think, perhaps, this is somewhat narrow and that there are fraud situations in which the damages may be somewhat broader than strict out of pocket loss, and I don't wish at this time to take direct issue with the plaintiff's argument as to the proper measure of damages. *I note only that we did not rely upon Civil Code Section 3343* ["out-of-pocket" rule] *as the applicable measure of damages. . . .*" (Italics ours.)

*5. Inflammatory evidence and argument (punitive damages).*

Paragraph 2(a) of the sales agreement between plaintiff and Ford provided for evaluating plaintiff's sales performance by a comparison of that performance with those of three reasonably comparable dealers. Ford used the records of five other dealers in deciding whether to terminate plaintiff's dealership. One of the five was a dealer named Saugstad. Another was the Kalim-Westler dealership.

At the trial Wendell J. Pomares, a certified public accountant, was called by plaintiff. He testified that he went to the Kalim-Westler place of business sometime in 1963 after it had ceased operation and found that the small building in which parts and equipment were kept had been locked by the Internal Revenue Service for nonpayment of withholding and payroll taxes. Defendant moved to strike this evidence on the ground that it was irrelevant, incompetent and lacked foundation. Plaintiff promised to connect it up through the later testimony of Mr. King. Pomares was then asked for his conversation with the internal revenue man. Defendant objected additionally on the ground of hearsay. The court then said that Pomares could tell what he observed but could not give the conversation since it would be hearsay. The court said that unless the matter was connected up it would grant defendant's motion to strike. When King testified, he said that he received a report that Kalim-Westler was in trouble with the Internal Revenue Service because "he didn't pay the taxes." Defendant's counsel objected "on the basis of foundation" and specified, "There is nothing in the record to show the nature of the Internal Revenue Service problem that Mr. Kalim-Westler Ford may or may not have had, the circumstances under which it arose. . . . It is pure speculation to assume at this point that the troubles that he may have had with the Internal Revenue Service stemmed from the operation of his business, let alone that they stemmed alone from the operation of his business during the period of time that we have involved in this comparison." The court then stated, "I am going to sustain the objection, Mr. Caplan [plaintiff's attorney], at least until you point out where in this comparison there is any figure that makes Kalim-Westler's difficulties with the Internal Revenue Service relevant to the comparison." Defendant's counsel suggested that there were many reasons for the Internal Revenue Service padlocking a door for a nonpayment of taxes and that the evidence did not

show that the instant padlocking was for business reasons. King was then asked if he knew, and he stated that he could not remember why the padlocking took place. There never was any evidence as to the reason for the padlocking.

Then there was the Saugstad situation. Saugstad was one of the five Ford "comparables." King was asked if Ford had considered terminating Saugstad's agency. He said that it was considered, but that Saugstad had sold out his agency before Ford acted. When asked why they were considering terminating the agency, King said that it was because Saugstad got in trouble with the Division of Motor Vehicles and that he understood Saugstad had been convicted of a misdemeanor. When asked if he knew what Saugstad did in this respect, he replied, "Not particularly." Defendant objected to testimony along this line and was overruled. King testified that he had read in the newspaper that Saugstad had some trouble with the division, "Something in connection with license or, if I remember correctly,—it's been a long time ago, . . . he sold cars and then bought them back and resold them as new cars." When asked if Saugstad repossessed cars, set the speedometer back to zero, and sold them as new cars, King said he did not remember. He further testified that the Division of Motor Vehicles revoked Saugstad's license but returned it to him in a few days. King added, "Now, what caused that, I don't know." The Saugstad events were in February-August 1961.

Without further explanation of Saugstad's acts, the court, over defendant's objection, admitted in evidence a judgment of the Superior Court of Placer County showing that Saugstad had been convicted of eight counts of violation of section 182, subdivision 1, of the Penal Code—conspiracy to commit a crime. The record fails to show what crimes Saugstad conspired to commit, nor was the jury instructed what the conduct prohibited by section 182, subdivision 1, was.

In his argument to the jury, plaintiff's counsel referred to Saugstad as "the fellow who was convicted of conspiracy up in Placerville." He rhetorically asked the jury, "what else have we got in the way of malice? Well, they picked in this termination five comparable dealers. . . . What a group. . . . Saugstad in Roseville . . .; the fellow—the partnership in Jackson that was padlocked by the Internal Revenue. . . ."

Neither the reasons for the padlocking of Kalim-Westler nor for the conviction of Saugstad were given the jury, nor

was either matter connected up to show how Ford acted maliciously in selecting these dealers as comparables in April 1963 or in seven months later making promises to plaintiff. In his argument to the jury, plaintiff's attorney relied principally on these two matters plus his contention that King must have had a malicious feeling towards plaintiff (of which there was no evidence) because plaintiff failed to sign the resignation letter for such an extended period and then finally did so in King's absence. This, according to plaintiff's counsel, was the "crowning insult . . . probably that was as bad a thing as you can do a man involving King if you had deliberately tried to arouse his malice." A reading of the record fails to disclose any evidence that King or any other of the Ford people had any feeling of malice toward plaintiff.

While it is true that later in the trial Ford introduced evidence that on learning of Saugstad's conviction Ford initiated proceedings to terminate the Saugstad franchise, and that hence Ford must have known the reasons for the conviction, the jury never knew the reasons. The Saugstad franchise was held by a corporation, and after the conviction and until the sale of Saugstad's business it continued under the management of Saugstad's mother. The agency agreement with Ford provided that Ford could terminate a dealership in the event of a dealer's conviction in a court of competent jurisdiction. As said by the trial court in this case, "the mere fact of that involvement neither makes Saugstad comparable or not comparable." The court further stated that it would sustain the defendant's objections unless plaintiff showed that "the Saugstad involvement for various crimes made the Saugstad dealership not comparable." Plaintiff never made such a showing. Defendant's evidence that Ford had started to terminate the Saugstad dealership because of Saugstad's conviction of a, to the jury, mysterious crime did not constitute a waiver by defendant of its objection to the introduction of the conviction nor make relevant plaintiff's attorney's reference to it in argument.

As the evidence failed to disclose what bearing the unexplained conviction and padlocking had on defendant's use of Saugstad and Kalim-Westler as comparables, plaintiff's counsel's argument was improper.

Section 3294 of the Civil Code provides, "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the

actual damages, may recover damages for the sake of example and by way of punishing the defendant." The trier of fact has a wide discretion in awarding such damages. (*Sullivan* v. *Matt* (1955) 130 Cal.App.2d 134, 143-144 [278 P.2d 499].)

However, a study of the record leaves this court in considerable doubt as to whether the jury, under the circumstances of this case, would have awarded for exemplary damages any sum at all had it not been for the prejudicial effect of the inflammatory evidence and the argument of counsel thereon hereinbefore set forth. The award bears an inference that it was arrived at by passion or prejudice engendered by the inflammatory evidence and argument. In view of that situation, the fairest thing to do is to send the case back to the trial court and to have a jury determine the amount, if any, which should be assessed for punitive damages uninfluenced by such explosive material.

An appellate court has power to remand the case for a retrial on the limited issue of exemplary damages. (*Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 733 [39 Cal.Rptr. 64].) *Fibreboard* (pp. 733-734) quoted from *Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791, 802 [197 P.2d 713] : "Upon a retrial of the issue of exemplary damages it is only necessary for the second jury to be advised of the amount of general damages already awarded in order that it may maintain a reasonable relation between such damages and the exemplary damages, if any, that it awards."

The fact that the jury found that Ford had not breached the written contract (count 1) is no indication that the jury disregarded the effect of the padlocking and conviction. The written contract provided that, in determining whether plaintiff's sales performance was as contemplated by the parties, his performance should be compared with the performances of three comparable dealers. In addition to the sales records of Saugstad and Kalim-Westler, defendant used the performances of three other dealers. The record shows that plaintiff himself agreed that his performance was insufficient under Ford's criteria. The evidence strongly shows that Ford was justified in terminating plaintiff's dealership. There was no inconsistency in the jury's finding to this effect and in their being influenced to grant punitive damages because of the above inadmissible evidence and counsel's inflammatory remarks. The jury's finding in Ford's favor on count 4 (conspiracy) was similarly consistent.

Although we recognize that under Civil Code section 3294 fraud is an alternative to malice as a basis for punitive damages, the evidence of *unaggravated* fraud on Ford's part was so strong as to compel the jury's award of compensatory damages under counts 2 and 3 regardless of the inflammatory evidence and argument concerning Saugstad and Kalim-Westler. Such evidence and argument acquired significantly prejudicial character only insofar as they related to the issue of punitive damages. As hereinbefore stated, this evidence was repeatedly objected to. Counsel's remarks were also objected to, but the court replied that it thought "there is [a] question for the jury" on "comparability."

The order denying Ford's motion for judgment notwithstanding the verdict is affirmed. The judgment is reversed insofar as it decrees the recovery of $100,000 exemplary damages, and the trial court is directed to retry only the issue of exemplary damages against defendant Ford Motor Company. In all other respects the judgment is affirmed. Plaintiff will recover costs on this appeal.

Pierce, P. J., and Regan, J., concurred.

Petitions for a rehearing were denied August 21, 1969, and the opinion was modified to read as printed above. The petitions of the appellant and the respondent for a hearing by the Supreme Court were denied September 17, 1969.