## ST. LOUIS AND SAN FRANCISCO RAILWAY COMPANY *v.* JOHNSTON.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 41. Argued Decembr 19, 1889. — Decided March 3, 1890.

A customary depositor in a bank in New York deposited with it a sight draft on a railway company in Boston. It was described as a " check " on the deposit ticket, which distinguished between " checks " and " bills." He had made similar deposits before, never drawing against them, the bank always reserving the right to charge exchange and interest for the time taken in collection. The depositor's bank-book was with the bank at the time of the deposit. No entry was made in it until some days later, and then not by direction of the depositor. The receiving teller applied to the cashier for instructions on the receipt of the deposit and was directed to receive it as cash. The bank sent the draft to Boston for collection, and it was collected there. Before that was done, the bank in New York, which was insolvent when the transaction took place, suspended, closed its doors, and never resumed; *Held,* that the question whether the bank had become the owner of the draft, or was only acting as the agent of its customer, was one of fact, rather than of law, and that there was not enough evidence to establish that the customer understood that the bank had become the owner of the paper.

When a bank has become hopelessly insolvent, and its president knows that it is so, it is a fraud to receive deposits of checks from an innocent depositor, ignorant of its condition, and he can reclaim them or their proceeds; and the pleadings in this case are so framed as to give the plaintiff in error the benefit of this principle.

FOR more than five years prior to the 6th day of May, 1884, the St. Louis and San Francisco Railway Company had an account with the Marine National Bank of the city of New York. On the 5th day of May of that year it drew a sight draft on the Atchison, Topeka and Santa Fé Railroad Company at Boston, Massachusetts, payable to the order of the Marine Bank, for the sum of $17,835, an amount due from the latter company, and sent the same to the Marine Bank with a deposit ticket filled up by the assistant treasurer of the San Francisco Company, in the following words and figures:

"Deposited by the St. Louis & San Francisco Railway Co. in
the Marine National Bank May 5th, 1884.

|  | Dollars. | Cents. |
|---|---|---|
| "Bills . . . . . . . . . . . . . | | |
| "Checks . . . . . . . . . . . . | $17,835 " | |

The messenger who took the draft and deposit ticket to the
bank had no special instructions, and handed them to an assist-
ant of the receiving teller, who was absent at the time. The
railway company's pass-book was then, and had been since
April 30, 1884, in the possession of the bank, and no entry was
made in it until some days afterwards, and then not by direc-
tion of the railway company. The assistant receiving teller
applied to the assistant cashier for instructions, and was by him
directed to receive the draft as cash, and it was so entered on
the credit ledger of dealers with the bank, but not with the
knowledge or by the request of the railway company. The
Marine Bank sent the draft to the Atlantic National Bank of
Boston for collection and credit, and it was by that bank pre-
sented to the Atchison Company on the 6th of May, 1884,
and that company at five minutes before one o'clock P.M. of
that day delivered its check on the National Bank of North
America to the Atlantic Bank, which was presented for pay-
ment and paid to the Atlantic Bank on May 7, 1884. The
Marine Bank was insolvent when it received the draft, and
closed its doors at twenty minutes before eleven o'clock on the
morning of the 6th of May, 1884, and never resumed business.

Walter S. Johnston was appointed receiver of the bank on
the 13th of May, 1884, and thereupon a correspondence ensued
between the receiver and the San Francisco Company, which
resulted in an agreement between them that the receiver might
retain the proceeds, subject to the right of the San Francisco
Company to assert its claim thereto, which it does in this
action. It is conceded that the Marine Bank never paid or
advanced anything to the San Francisco Company on the
draft, and that the latter, at the time the draft was sent to the
bank, or at any time since, was not indebted to it. The balance
to the credit of the railway company in the Marine Bank at
nine o'clock A.M. on May 6, 1884, not including the draft, was

$117,981.72, besides some checks it had drawn and which i was obliged to take up.

The treasurer and assistant treasurer of the railway company testified that there was no arrangement or understanding, verbal or written, or dealing, to their knowledge, with the Marine Bank, by which the San Francisco Company was authorized or entitled to draw against out-of-town paper before actual collection, and that no drafts were ever so drawn; that they knew of no such agreement, verbal or in writing; that they drew on what they had and not on what they did not have; that the railway company had no occasion to draw against drafts or checks before collection, and did not do so; and that the company was allowed interest on its daily balances. Four deposits of out-of-town paper, other than that in question, were proven to have been made under the dates of August 23, August 27 and November 3, 1883, and April 10, 1884. The deposit tickets in each case referred to the deposit as "checks." The deposits of August 23, August 27 and November 3, were made up of two items each, but neither was marked on the tickets as cash, and there was no evidence that either of them was. The receiving teller testified that generally foreign paper, (paper outside of the city of New York,) of large amount, when received, was marked "F," and such a mark in red pencil appeared on the deposit tickets of November 3, 1883, for $17,860; of April 10, 1884, for $18,930; and of May 5, 1884, for $17,835, being the deposit in controversy. The witness said this was done, so "that if any of the officers should ask what certain checks consisted of — if a large deposit — we would be able to tell." These drafts or checks on banks outside of the city were kept on a slip called "foreign and general office slip," and put in a different pigeon-hole from that where domestic paper was placed.

The assistant note-teller had charge of the transmission of paper drawn on banks or persons outside of the city of New York, and testified thus: "Q. And all that you had to do, as it was out-of-town paper, was to transmit it for collection, was it not? A. And see that we got the money back again. Q. Those were all your duties in regard to it? A. Well, I had

other duties. Q. What were they? A. To see that the St. Louis and San Francisco Railway Company did not deposit too many large foreign checks as cash. Q. Why did you do so? A. Because I had entire charge of the foreign checks. The foreign checks are usually out five days, and that is five days' interest, and unless those concerned kept a large balance we charged them exchange, and where we paid interest on the balances we then charged interest and exchange where they kept large balances, and for that reason we watched all foreign checks deposited. . . . Q. What were the instructions you received in regard to the St. Louis and San Francisco Railway Company? A. To see whether they were depositing many large foreign checks and how much it cost, and whether it was advisable to get exchange from them. . . . Q. Do you recollect what officer it was who gave you those instructions? A. No, sir. Q. Did you ever after that enforce them? A. I do not understand the meaning of the word 'enforce.' I notified the officers of all large checks deposited by the St. Louis and San Francisco Railway Company. Q. How frequently? A. I don't remember; as often as they came in."

This particular draft was marked "F," and put in the foreign pigeon-hole, and credited as cash by direction of the assistant cashier. The form of letter universally used in transmitting foreign paper for collection was put in by defendant, and contained this paragraph: "Please return as promptly as possible all unpaid collections protested, unless marked thus X, when please return without protest." In the five instances of the deposit of these out-of-town drafts, they were credited to the San Francisco Company on the bank's books, and the San Francisco Company entered and added their amount on the margin of its check-book.

It appeared from the evidence that the bank had been insolvent for a year, and that it was hopelessly so on Saturday, the third day of May, and until its doors were closed. The receiver said that he got judgment for over $730,000 on the over-drafts of a firm doing business with the bank, which over-drafts occurred in the last two or three days in one account, and had been running for two or three weeks in the other

account; that the over-draft in the individual account of one of the partners amounted to $140,000 ; in the firm account, to $300,000; and in the firm special account, to $350,000, most of which was before Saturday, the 3d of May.   Estimating the assets of the bank at what they were actually worth, and not at their face value, the deficit, according to the receiver's judgment when he took charge, was over a million and a half of dollars.   The bank was really insolvent from the time the indebtedness from the firm in question, which was insolvent, grew to such a point, that, if called and not paid, the bank could not meet its obligations.   The president of the Marine Bank was a partner of that firm.

The bill in this case was filed to obtain the proceeds of the draft as the property of the San Francisco Company, and, among other things, alleged:

"On the said 5th day of May it was well known to the said bank and to its officers, and so the fact was, that the said bank was insolvent; and, well knowing the fact, the said bank wrongfully neglected to disclose the same to your orator, but by continuing business with open doors, and otherwise representing to your orator and all other persons dealing with it that the said bank was solvent, and on the faith of such representations, your orator believed the said bank to be solvent, and had no knowledge or suspicion or means of knowing that it was insolvent or in danger of becoming so, and, acting upon such representations and relying on the solvency of said bank your orator delivered the said draft to it, and the bank received the same for collection as aforesaid.   Thereafter, and on the same day, the said bank, by its cashier, endorsed the said draft as follows:   'Pay Atlantic National Bank of Boston or order, for collection, for account of Marine National Bank of the city of New York,' and transmitted the said draft, so endorsed, to the said Atlantic National Bank for collection."

And "that, by reason of the premises, the said draft, when delivered as aforesaid to the said bank, did not become the property of the said bank, and that your orator did not part with its title to or interest in the said draft, but that it re-

mained the property of your orator, and that the proceeds of the said draft, when collected, likewise did not become the property of the said bank, or of the defendant, but remained always, and still are, the property of your orator, and your orator is entitled to follow them specifically into the hands of the defendant and to recover them from him." Upon final hearing the bill was dismissed, and the opinion of the Circuit Court will be found reported in 23 Blatchford, 489, and in 27 Fed. Rep. 243.

*Mr. John E. Burrill* for appellant.

*Mr. Charles E. Miller* for appellee.

I. The deposit of a check in a bank accepted by it and credited to the depositor creates a debt and vests the property in the check in the bank. *Metropolitan Nat. Bank* v. *Loyd,* 90 N. Y. 530; *Cragie* v. *Hadley,* 99 N. Y. 131; *Bank of the Republic* v. *Millard,* 10 Wall. 152; *Scammon* v. *Kimball,* 92 U. S. 362, 370; *Libby* v. *Hopkins,* 104 U. S. 303, 308.

II. The law will not presume, from the mere fact that this deposit was of out-of-town paper, that any different result followed from the deposit than in the case of other paper. No such distinction exists in law, and no custom or course of dealing has been shown to create any such distinction.

The case comes before the court as an ordinary deposit of cash or checks.

III. The case of *Scott* v. *The Ocean Bank,* 23 N. Y. 289, cited by appellant's counsel, is not in his favor.

The court, in that case, bases its decision mainly upon the fact that neither by express agreement nor by any previous dealings was it shown that the depositor was entitled to a credit for bills remitted by him.

At page 290 the court says: "It is not shown nor claimed that there was an express agreement between the company and Lyell that he should, on the receipt by it of the bills remitted, be entitled to have a credit in the account between them for the amount thereof; nor is it found that in the course

of the dealings between them any credit was in fact ever given to him for any of such bills until the proceeds thereof were realized and received."

And at page 292 the court says : " When, therefore, it appears that the bill in question was retained in the possession of the company after its acceptance, and that no credit had been given for it at the time it was passed to the defendants, and when nothing is disclosed in the whole course of dealings, between the parties, to show that any bill was ever credited or agreed to be credited in account before its collection, or that Lyell ever drew, or was entitled to draw, upon the company, or that it was bound to accept drafts otherwise than upon and for funds actually received in cash it must be considered that the company, at the time of the transfer, stood in the relation of agents for its collection merely."

. In the case at bar, the facts clearly establish a course of dealing between the parties of credits for similar bills at the time of their deposit, and the court has so.found.

In the Scott case the court also dwells upon the fact that the depositor himself. was not a party to the bill.

In Dickinson v. Wason, 47 N. Y. 439, the note was in terms sent for collection.

In Balbach v. Frelinghuysen, 15 Fed. Rep. 683, cited by plaintiff, the court lays stress upon the fact that the account between the parties had not changed between the date of the deposit and the failure of the bank, and that no draft had been drawn by the depositor.

In the case at bar the plaintiff did draw checks after the deposit, and before the failure, against its gross balance in the bank, and such checks were paid and the account between the parties had changed after the deposit.

IV. If it was the fact that the bank was insolvent when the deposit was made, it would not affect the transaction. ·

(a) Fraud cannot be imputed to a party who contracts a debt, knowing that he is insolvent, merely from the fact of his insolvency and his omission on a purchase of property on credit to disclose that fact to his vendor. Nichols v. Pinner, 18 N. Y. 295; Nichols v. Michael, 23 N. Y. 264; S. C. 80 Am.

Dec. 259; *Wright* v. *Brown*, 67 N. Y. 1; *People's Bank* v. *Bogart*, 81 N. Y. 101; *Morris* v. *Talcott*, 96 N. Y. 100.

V. There is no evidence that the directors of the bank had any knowledge of its condition. Such knowledge cannot be presumed where fraud is charged. *Wakeman* v. *Dalley*, 51 N. Y. 27.

Knowledge by any of the officers of a bank of its insolvency, is insufficient to avoid transactions between the bank and its customers, on the ground of fraud, unless the evidence clearly shows that the directors who represent the corporation also had such knowledge. *Balbach* v. *Frelinghuysen*, 15 Fed. Rep. 683.

VI. The bill contains no allegation that the officers of the bank entertained any fraudulent intention toward the plaintiff in receiving the deposit, and a recovery cannot be had upon that theory. The decree must be *secundum allegata*.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

This was not the deposit of a check on the Marine Bank itself. In such a case it was held in *Oddie* v. *National City Bank*, 45 N. Y. 735, that the check, if received and credited, could not be charged back for want of funds. Nor was it a check on another bank, as to which Church, C. J., remarks, a different principle would be applied, as the presumption of agency might arise. It was a sight draft drawn by the San Francisco Company on its debtor in Boston, and collected through the Marine Bank's correspondent at that place. Neither it, nor the money collected upon it, passed into the hands of any third person for value. The collection was made after the Marine Bank had closed its doors. It is not claimed that there was any express arrangement or understanding between the San Francisco Company and the bank that the deposits of out-of-town paper should be treated as cash. Can such an understanding be implied from the mere fact that the San Francisco Company was credited with the draft upon the books of the bank, as if the deposit were of money, although the deposit ticket named it under the head of checks, and that the com-

pany itself added on the stubs of its check-book such deposits to the current amount, coupled with an alleged commercial usage to allow good customers to draw against a credit thus created? In five years of business between them, the San Francisco Company had never drawn against such paper. The evidence of the bank's clerks leaves no doubt that, as to out-of-town drafts for large amounts, the bank kept track of them and reserved the right to charge exchange and also interest for the average time taken in collection, notwithstanding its agreement to pay interest on the daily balances. This was not consistent with the theory of an understanding between the bank and the company that the title to this and similar drafts should pass absolutely to the bank. If the draft had not been paid, the bank could have cancelled the credit, as it clearly accepted no risk on the paper. The draft was entered at its full value, which indicated that it was not discounted, but credited for convenience and in anticipation of its payment.

It is settled law in this court that the holder of a bank check cannot sue the bank for refusing payment, in the absence of proof that it was accepted by the bank or charged against the drawer, (*Bank of The Republic* v. *Millard,* 10 Wall. 152; *First National Bank* v. *Whitman,* 94 U. S. 343, 344; *Laclede Bank* v. *Schuler,* 120 U. S. 511, 514;) but the depositor can sue for the breach of the contract to honor his checks. If, under the circumstances disclosed in this case, the only balance the San Francisco Company had was made up of the deposit of this draft, and it had drawn against it, and the bank had declined to honor the check, could the San Francisco Company have sustained an action on the ground of a general commercial usage, when by the course of dealing for five years it had never drawn against paper so deposited? Because banks often let good customers overdraw, do the latter thereby get the right to do so when the bank deems it improper to permit it? Undoubtedly if the San Francisco Company had overdrawn, and this draft had been credited to cover the over-draft, or if the company had drawn against the draft, the bank could hold the paper until the account was squared. And if the bank had transferred the draft to one occupying the position of a *bona*

*fide* holder, such transfer would have conferred title on its transferee by reason of its reputed ownership, so far as the latter was concerned. *Metropolitan National Bank* v. *Loyd*, 90 N. Y. 530.

In that case, as reported in 25 Hun, 101, which was affirmed in 90 N. Y. 530, the Court of Appeals remarking in reference to the opinion that it "so fully reviews the evidence and the authorities, that we should be content with simply expressing our concurrence, if the case had not been sent here by that court as involving a question of law which ought to be reviewed," the Supreme Court says "that the intention that the check should be received as cash is to be inferred from the fact that the check was due immediately and was drawn on a bank, and for all purposes of the parties was equivalent to so much money, . . . and such intention is confirmed by preceding transactions, admitted by the depositor, in which checks were deposited and entered as cash in his bank book, and that the custom of the bank in its dealings with him was to credit him with all checks as money."

And in *Scott* v. *Ocean Bank*, 23 N. Y. 289, it was held that "the property in notes or bills transmitted to a banker by his customer to be credited the latter, vests in the banker only when he has become absolutely responsible for the amount to the depositor," and that "such an obligation, previous to the collection of the bill, can only be established by a contract to be expressly proved or inferred from an unequivocal course of dealing."

"Every man who pays bills not then due into the hands of his banker," said Lord Ellenborough in *Giles* v. *Perkins*, 9 East, 12, 14, "places them there as in the hands of his agent to obtain payment of them when due. If the banker discount the bill, or advance money upon the credit of it, that alters the case; he then acquires the entire property in it, or has a lien on it *pro tanto* for his advance."

If there be no bargain that the property should be changed, the relation resembles that of principal and agent. Mere liberty to draw does not make out such a bargain, particularly where interest is allowed by the banker upon the bills only

.rom the time when their amount is received. *Ex parte Bark-worth*, 2 De G. & J. 194; *Thompson* v. *Giles*, 2 B. & C. 422; *Ex parte Sargeant*, 1 Rose, 153.

The question was one of fact rather than of law, and we think there should be something more in the evidence tending to establish that the San Francisco Company understood that the bank had become owner of the paper, than these mere credits for convenience, before that can be held to be the fact, notwithstanding it may be a recognized usage to allow a customer to draw. So far from there being shown an unequivocal course of dealing tending to support that conclusion, it seems to us the tendency of the evidence is otherwise.

But if there could be any question on that branch of the case, we are unable to see that there could be on the other. This bank was hopelessly insolvent when the deposit was made, made so apparently by the operations of a firm of which the president of the bank was a member. The knowledge of the president was the knowledge of the bank. *Martin* v. *Webb*, 110 U. S. 7, 15; *Bank* v. *Walker*, 130 U. S. 267; *Cragie* v. *Hadley*, 99 N. Y. 131. In the latter case it was held that the acceptance of a deposit by a bank irretrievably insolvent, constituted such a fraud as entitled the depositor to reclaim his drafts or their proceeds. And the *Anonymous Case*, 67 N. Y. 598, was approved, where a draft was purchased from the defendants, who were bankers, when they were hopelessly insolvent, to their knowledge, and the court held the defendants guilty of fraud in contracting the debt, and said their conduct was not like that of a trader " who has become embarrassed and insolvent, and yet has reasonable hopes that by continuing in business he may retrieve his fortunes. In such a case he may buy goods on credit, making no false representations, without the necessary imputation of dishonesty. *Nichols* v. *Pinner*, 18 N. Y. 295; *Brown* v. *Montgomery*, 20 N. Y. 287; *Johnson* v. *Morrell*, 2 Keyes, 655; *Chaffee* v. *Fort*, 2 Lans. 81. But it is believed that no case can be found in the books holding that a trader who was hopelessly insolvent, knew that he could not pay his debts and that he must fail in business and thus disappoint his creditors, could honestly take

advantage of a credit induced by his apparent prosperity and thus obtain property which he had every reason to believe he could never pay for. In such a case he does an act, the necessary result of which will be to cheat and defraud another and the intention to cheat will be inferred." And it was decided that "in the case of bankers, where greater confidence is asked and reposed, and where dishonest dealings may cause widespread disaster, a more rigid responsibility for good faith and honest dealing will be enforced than in the case of merchants and other traders;" and that "a banker who is, to his own knowledge, hopelessly insolvent, cannot honestly continue his business and receive the money of his customers; and although having no actual intent to cheat and defraud a particular customer, he will be held to have intended the inevitable consequences of his act, *i.e.* to cheat and defraud all persons whose money he receives, and whom he fails to pay before he is compelled to stop business."

The Circuit Court did not, in the present case, express any different view, but held that the bill was not properly framed to present the question. Certainly there must be sufficient equity apparent on the face of a bill to warrant the court in granting the relief prayed; and the material facts on which the complainant relies must be so distinctly alleged as to put them in issue. *Harding* v. *Handy*, 11 Wheat. 103. And if fraud is relied on, it is not sufficient to make the charge in general terms. "Mere words, in and of themselves, and even as qualifying adjectives of more specific charges, are not sufficient grounds of equity jurisdiction, unless the transactions to which they refer are such as in their essential nature constitute a fraud or a breach of trust, for which a court of chancery can give relief." *Van Weel* v. *Winston*, 115 U. S. 228, 237; *Ambler* v. *Choteau*, 107 U. S. 586, 591. The defendant should not be subjected to being taken by surprise, and enough should be stated to justify the conclusion of law, though without undue minuteness.

The bill alleged that the bank was insolvent on the 5th day of May; that this was well known to its officers; that it wrongfully neglected to disclose its insolvency to complainant,

and, by continuing business and otherwise, represented to complainant and all other persons dealing with it, that it was solvent; that complainant, on the faith of these representations believed such to be the fact, without suspicion that the bank was, or was in danger of becoming, insolvent; that, acting upon the representations, and relying on the bank's solvency, complainant delivered the draft; that next morning the bank closed its doors, and the draft was collected thereafter; and that, by reason of the premises, the draft or its proceeds did not become the property of the bank. The receiver in his answer specifically denied these averments. We think the issue thus framed was sufficient to enable the court to proceed to a decree. The fraudulent intention flowed from the guilty knowledge, and the bank must be held to the consequences of a representation which it knew to be contrary to the fact, and upon which the complainant innocently acted. Granted that the mere omission to disclose the insolvency, if there had been ground for the supposition that the bank might continue in business, would not be sufficient, there is nothing for such a belief to rest on here. As a matter of pleading, the averment was that the bank wrongfully neglected to make the disclosure; as a matter of fact, the condition of the bank was so hopeless that it was its duty to make it. The omission to specifically state in the pleading the degree of insolvency which rendered the bank's conduct fraudulent, was not fatal, as the conclusion asserted showed the intention of the pleader, and the particular contention could fairly be tested on the hearing.

*The decree is reversed, and the cause remanded with directions to enter a decree in favor of the complainant according to the prayer of the bill and to take further proceedings in conformity with this opinion.*

MR. JUSTICE BREWER was not a member of the court when this case was argued, and took no part in its decision.