FIDELITY SAVINGS AND LOAN ASSOCIATION, a corporation, Plaintiff,

v.

AETNA LIFE AND CASUALTY CORPORATION, a corporation, Fireman's Fund Insurance Company, a corporation, Republic Insurance Company, a corporation, et al., Defendants.

SECURITY SAVINGS AND LOAN ASSOCIATION, a California Corporation, Plaintiff,

v.

FIDELITY AND DEPOSIT COMPANY OF MARYLAND, a Maryland Corporation, Defendant.

Nos. C–51126, C–45642.

United States District Court, N. D. California.

Aug. 31, 1977.

John H. Finger, Hoberg, Finger & Brown, San Francisco, Cal., for plaintiff Security Sav. and Loan Ass'n.

Jon H. Kouba, Trump, Kouba & Dickson, San Francisco, Cal., for plaintiff Fidelity Sav. and Loan Ass'n.

Scott Conley, Douglas M. Moore, Jr., Sedgwick, Detert, Moran & Arnold, San Francisco, Cal., for defendants Fidelity and Deposit Co. of Maryland, Aetna Life and Cas. Co., and Fireman's Fund Ins. Co.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

These consolidated cases arise generally from the failure of the San Francisco National Bank (hereafter "SFNB"). That bank was closed by the Comptroller of the Currency on January 22, 1965, after a period of its economic distress. On the date of closure, plaintiff Security Savings and Loan Association (hereafter "Security") had on deposit with the bank certificates of deposit totaling $600,000. The predecessors in interest to plaintiff Fidelity Savings and

Loan Association (hereafter "Fidelity")[1] had on deposit $1,204,669.40, in the form of certificates of deposit and a commercial checking account. Neither plaintiff recovered its deposits in full.[2]

At the time of the bank's failure, both Security and Fidelity were insured by the respective defendants under a standard savings and loan association blanket bond, Form No. 22, as required by 12 C.F.R. § 563.19. Clause (E) of these bonds provided that the insured would be indemnified for, "[a]ny loss of property [occurring] through any other form of fraud or dishonesty by any person or persons whether employees or not." Contending that the loss of their deposits resulted from various fraudulent or dishonest acts of the SFNB, plaintiffs brought this action to recover their losses pursuant to the blanket bond.[3]

A brief history will help place the issues raised by the parties into context. The San Francisco National Bank began operations approximately June 1, 1962. Management of the bank was largely vested in Donald C. Silverthorne, its president and board chairman. Almost from the bank's inception, Silverthorne engaged in the practice of extending credit of the bank in exchange for the payment of "loan fees." Such fees, over and above normal interest charges, were personally pocketed by Silverthorne. In some cases they were split between Silverthorne and Mr. William S. Bennett, whose personal guarantee was frequently the basis for extension of credit. Over 60 borrowers paid loan fees kept by Silverthorne.

Most of the borrowers receiving credit in exchange for loan fees were not creditworthy. Combined with a large number of additional uncollectable loans, not involving loan fees, the assets of the bank were seriously weakened.

These conditions were discovered by the Comptroller of the Currency during the course of a routine examination of the bank conducted in May and June, 1964. The Comptroller ordered weekly visitations to the SFNB by federal bank examiners, as a means of monitoring efforts to strengthen the bank's financial position. The bank was able to meet its obligations as they fell due during the remainder of 1964 only through heavy borrowing from the Federal Reserve Bank. The SFNB did not have sufficient resources, however, to meet the demands created by a heavy concentration of certificates of deposit maturing in January, 1965. On January 22, 1965, the bank was finally closed by the Comptroller of the Currency.

In a series of pretrial rulings, this court concluded that it had jurisdiction over the subject matter of the instant controversy,[4] that the applicable blanket bonds were sufficiently broad to encompass loss of savings and loan association funds deposited in banking institutions if such loss was caused by fraud or dishonesty,[5] that certain claims had been waived by the parties,[6] and, finally, that various patterns of conduct might constitute "fraud" or "dishonesty" under the terms of the bond.[7]

1. Fidelity's predecessors in interest include Transbay Savings, which had on deposit $1,000,000 in the form of a certificate of deposit dated May 7, 1964 and $4,669.40 in a commercial checking account, as well as Beneficial Savings, which had on deposit $200,000 in the form of two certificates of deposit each in the sum of $100,000 dated July 22, 1964 and October 21, 1964.

2. The Federal Deposit Insurance Corporation ("FDIC") paid each party the insurance proceeds due depositors in federally insured banks and, as receiver of the SFNB, the FDIC paid depositors a liquidating dividend of over 52% of the deposits, leaving unrecovered the total sum of $488,345.64 for Fidelity, and $243,-434.05 for Security.

3. The instant actions were initially consolidated with numerous other suits brought in the wake of SFNB's failure by savings and loan associations seeking recovery on their respective blanket bonds. The other actions were settled prior to trial.

4. See Order of May 15, 1969.

5. See Orders of November 21, 1972, November 24, 1974 and January 10, 1975.

6. See Order of January 16, 1975.

7. See Memorandum of October 22, 1974, and Order of January 10, 1975.

At trial, plaintiffs advanced three theories of recovery. The first, applicable only to the Security cause of action, is that Silverthorne fraudulently induced Security to renew a maturing certificate of deposit by making false representations as to SFNB's financial soundness. Plaintiffs' second theory, applicable to both Security and Fidelity, is that SFNB's acceptance of their respective deposits was dishonest, inasmuch as the bank was, at the time of acceptance, insolvent within the knowledge of its managing officers. Finally, both plaintiffs contend that the making of dishonest loans by the SFNB caused the bank to fail, and thus that "dishonesty" is responsible for their losses. We address these theories in turn.

### (A) Security's Fraudulent Misrepresentation Claim

The facts upon which Security premises its claim of fraudulent misrepresentation may be summarized as follows. During the fall of 1964, Security had on deposit with the SFNB several certificates of deposit. One was in the amount of $250,000, with a maturity date of September 6, 1964. Another was a $700,000 certificate of deposit, maturing on October 20, 1964. The bank failed to pay the former certificate as it fell due. Concerned about that default, as well as payment of the $700,000 certificate about to mature, John J. Peters, board chairman of Security, arranged a meeting with Silverthorne to discuss these matters. Peters, accompanied by Lowell H. Duggan, a board member of Security, met with Silverthorne prior to October 20, 1964.

At that meeting, according to the uncontradicted testimony of Peters and Duggan, Silverthorne made express representations of SFNB's financial soundness. He stated that the bank's earnings were strong, that there were no particular problems with the loan portfolio, and that he expected to be able to meet withdrawal demands adequately. Silverthorne blamed the previous default on a temporary liquidity shortage induced by banking regulatory changes limiting the amount of certificates of deposit permissibly held in banks by savings and loan associations, thereby causing nonrenewal of many certificates of deposit. Peters and Duggan were aware of these regulatory changes. At no time did Silverthorne reveal that SFNB was financially unstable, that the bank was being closely monitored by the Comptroller of the Currency, that many assets of the bank were of questionable value, or that there was a possibility of financial failure.

Silverthorne promised immediate payment on the overdue certificate of deposit, but requested that payment on the $700,000 certificate be spread out over a period of months to help alleviate the liquidity crunch. Peters agreed to this arrangement. The $700,000 certificate was thereafter surrendered, and seven separate certificates in the amount of $100,000 each were issued in its stead. The first such certificate matured in November, 1964, while the others were to mature in subsequent months. As promised, the overdue $250,000 certificate was paid, as was the first maturing $100,-000 certificate. No further payments were received by Security.

Security contends that the renewal of its $700,000 certificate of deposit was fraudulently induced by Silverthorne, and thus that their loss resulted from a peril insured against by the blanket bond. Both parties have looked to California law to define the elements of fraudulent misrepresentation.

■ A cause of action based upon fraudulent misrepresentation requires a showing of six distinct elements: (1) misrepresentation; (2) scienter; (3) intent to induce reliance; (4) actual reliance; (5) justifiable reliance; and (6) resulting damages. See Witkin, *Summary of California Law,* Torts § 446, at 2711. Defendant [8] does not seriously contest the fact that Silverthorne misrepresented to Peters and Duggan the financial condition of SFNB, that Silverthorne knew these representations to be

8. With respect to the section of this opinion concerned with Security's fraud cause of action, "defendant" refers to defendant Fidelity and Deposit Company of Maryland, while "plaintiff" refers to Security Savings and Loan Association.

false, nor that the representations were intended to induce Security to renew its certificate of deposit. Rather, defendant's contention is that the elements of actual and justifiable reliance are absent.

Defendant's reliance argument is premised upon the contention that Silverthorne and Peters participated together in a series of questionable financial transactions between their respective institutions, and thus that Peters had knowledge of the irresponsible and unethical manner in which Silverthorne managed the SFNB. Either Peters suspected that the bank must be financially unsound and did not rely upon Silverthorne's representations, defendant contends, or Peters at the least knew enough that such reliance was unjustifiable without an independent investigation.

A brief summary of defendant's charges of unethical conduct by Peters and Silverthorne is necessary to bring the issues presented into clear focus. In substance, defendant alleges that: (1) Peters cooperated with Silverthorne to inflate the assets of SFNB by making a $5,000,000 deposit of Security funds for a short period coinciding with a date upon which SFNB (in conjunction with all other banks) had to disclose its balance sheet to the Comptroller of the Currency; (2) in an unrelated transaction, Peters arranged to inflate the assets of both Security and SFNB through a complex transaction involving the deliberate floating of two checks in such a manner as to have the same $4,000,000 appear simultaneously as assets in both institutions over the year end; and (3) Peters arranged a $250,000 deposit of Security funds in SFNB on the same day that he received a personal loan from SFNB in the amount of $300,000. The proceeds of the Peters loan were in turn loaned to Mr. Harry Stockman, later a SFNB director, who had already borrowed to SFNB's legal lending limit. The Stockman loan was repaid by Stockman's borrowing of funds from the SFNB, after Security's sister corporation, Sequoia Mortgage Company, reduced Stockman's liability to the SFNB by purchasing one of Stockman's loans from SFNB.

Based upon these transactions, defendant urges the court to draw the inference that Peters placed no actual or justifiable reliance upon the misrepresentations made by Silverthorne. Actual reliance is absent, defendant contends, because "[g]iven his personal knowledge of Silverthorne, Peters did not rely on his statements, but rather on his belief that if the bank got into trouble the Federal Reserve would step in and save the bank." Defendant Fidelity and Deposit Company's Post Trial Brief, p. 14. Even assuming that Peters in fact relied upon Silverthorne, defendant contends, such reliance was not justified without independent inquiry or investigations as to the true condition of the bank.

We believe that the evidence clearly supports the finding that Peters actually relied upon the misrepresentations of Silverthorne. We so conclude for several reasons.

First, there is significant circumstantial evidence suggesting such reliance. Peters was sufficiently concerned about the previous default on the $250,000 certificate of deposit to request a meeting with Silverthorne to receive assurances. He agreed to the renewal of the $700,000 certificate only after receiving such assurances coupled with the promise of immediate payment of the overdue certificate. There is no evidence that Peters had ever been misled by Silverthorne in their previous dealings, and thus little basis upon which to infer that Peters would have disbelieved him on this occasion. Nor is there any evidence that Peters had actual knowledge of SFNB's weak financial condition. Silverthorne's explanation of the prior default was relatively credible, inasmuch as it related to changes in banking regulations regarding savings and loan association deposits in banking institutions, a regulation of which Peters was aware. Finally, Peters did subsequently refuse a request by SFNB officials to renew an unrelated $300,000 certificate of deposit maturing on December 30, 1964. At the time of this request, Silverthorne had been removed as president of the bank, and the possibility of serious trouble

in the bank was finally evident. In short, it seems highly unlikely that Peters would have renewed the $700,000 certificate of deposit had Silverthorne honestly answered Peters' inquiries regarding the condition of the bank and the reasons for the prior default.

Second, the transactions questioned by defendant have only tangential relevance to the actual reliance issue. None forms an adequate basis for inferring that Peters actually knew or suspected that the bank was in financially weakened condition as the result of the extension of unjustified credit. Nor is there evidence that Silverthorne had previously misled or deceived Peters in any way. In that light, the fact of an established working relationship between Peters and Silverthorne, regardless of the ethics of the transactions involved, tends to strengthen rather than weaken the inference of actual reliance. Accordingly, we conclude that Peters actually relied on Silverthorne's misrepresentations, and turn to defendant's primary argument, that Peters' reliance was unjustified.

The California rule of justifiable reliance was elaborated by Justice Traynor in *Seeger v. Odell*, 18 Cal.2d 409, 115 P.2d 977 (1941):

It must appear, however, not only that the plaintiff acted in reliance on the misrepresentation but that he was justified in his reliance . . . Negligence on the part of the person in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather than negligent . . The fact that an investigation would have revealed the falsity of the misrepresentation will not alone bar his recovery . . Nor is the plaintiff held to the standard of precaution or of minimum knowledge of a hypothetical reasonable man . . If the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable, however, he will be denied a recovery. [Citations omitted.] "He may not put faith in representations which are preposterous, or which are shown by facts within his ob-

servation to be so patently false that he must have closed his eyes to avoid discovery of the truth . . ." [citations omitted].

18 Cal.2d at 414–15, 115 P.2d at 980–981. *Seeger's* liberal rule of justifiable reliance has been given frequent application by the California courts. See e. g., *Anderson v. Thacher*, 76 Cal.App.2d 50, 172 P.2d 533 (1946); *Blackman v. Howes*, 82 Cal.App.2d 275, 185 P.2d 1019; *Meyer v. Ford Motor Company*, 275 Cal.App.2d 90, 79 Cal.Rptr. 816 (1969); *Hartong v. Partake*, 266 Cal. App.2d 942, 72 Cal.Rptr. 722 (1968); *Kahn v. Lischner*, 128 Cal.App.2d 480, 275 P.2d 539 (1954); *Hefferan v. Freebairn*, 34 Cal.2d 715, 214 P.2d 386 (1950).

■ *Hefferan v. Freebairn, supra,* is relatively typical. There, plaintiff sued to rescind a contract purchasing defendant's business, on the ground that recent earnings of the business had been misrepresented. Applying *Seeger,* Justice Traynor affirmed the lower court's finding of justifiable reliance despite plaintiff's examination of defendant's profit and loss statement indicating substantially lower profits than those previously represented by the defendant. Defendant had explained the discrepancy by the fact that certain trade rebates were not shown on the statement. Plaintiffs' reliance on defendant's explanation, and failure to further investigate, were not viewed by the court as sufficiently unreasonable to bar recovery. See also *Blackman v. Howes, supra; Meyer v. Ford Motor Company, supra* ; and *Hartong v. Partake, supra.* In contrast, where the falsity of the defendant's representations should unquestionably have been discovered by the plaintiff, justifiable reliance is absent, and recovery for fraud barred. See e. g., *Carpenter v. Hamilton,* 18 Cal.App.2d 69, 62 P.2d 1397 (1936); *Cameron v. Cameron,* 88 Cal. App.2d 585, 199 P.2d 443 (1948); *Carter v. Seaboard Finance Co.,* 33 Cal.2d 564, 203 P.2d 758 (1949).

■ Defendant contends that, in view of Peters' knowledge regarding the management of SFNB by Silverthorne, Peters was unjustified in accepting Silverthorne's rep-

resentations without an independent investigation to determine the facts. We disagree, and conclude for the reasons stated below that Peters' reliance was justified under the applicable standard, despite possible impropriety in the prior conduct of the parties.

At the onset we observe that the dispositive issue presented in this litigation is not whether the previous transactions between Peters and Silverthorne were laudable. Rather, the issue is whether, on the particular occasion in question, Peters was deceived by Silverthorne into renewing the $700,000 certificate of deposit. In examining the transactions questioned by defendant, therefore, inquiry must be focused upon whether they support the conclusion that Peters was sufficiently aware of the condition of SFNB, or of Silverthorne's proclivity for misrepresentation, that reliance was unjustified.

The first two transactions raised by the defendant are instances in which Peters allegedly assisted Silverthorne to inflate the assets of SFNB on "call dates," dates upon which all banks must report their balance sheet to the Comptroller of the Currency.[9] On the first occasion, over the June 30, 1963, call date, Security made a short-term deposit in the amount of $5,000,000 in SFNB. Apparently, however, the practice of banks soliciting short-term deposits to boost their call date assets was not particularly uncommon at the time in question, see testimony of Mr. Sutherland, Tr. 2393–94, and the transaction may have had a valid economic purpose from Security's perspective in allowing it to receive interest on short-term funds. On the other hand, the amount involved was substantial, and Silverthorne apparently violated banking regulations in allowing early withdrawal of the certificate.

The second call date transaction, over the 1963 year end, involves more serious charges. Here defendant alleges that Security participated in the inflation of SFNB assets not by making a direct deposit into SFNB, but rather by withholding collection of a check drawn on SFNB in such a manner that the same $4,000,000 would appear on the books of both institutions simultaneously.[10] Despite Security's vigorous denial that it participated in an intentional float of the funds, the circumstances are highly suspicious.[11]

Even assuming that the call date transactions occurred as charged by the defendant, however, we find the evidence insufficient to deny recovery by Security. While in no sense condoning the conduct alleged, we

---

**9.** There are four "call dates" each year. Two dates are "floating" dates, not announced in advance by the Comptroller, while the others fall on June 30 and December 31 of each year.

**10.** The transaction was initiated when Security sought to increase its own deposits by $5,000,000 over the year end. Security's purpose was to take advantage of a proposed change in regulations relating to savings and loan associations thought to be premised upon the volume of an association's deposits at the time in question. Security arranged for Mr. Stockman to borrow $5,000,000 from United California Bank on December 30, 1963 and to deposit these funds into Security. Before so doing, however, Stockman deposited $4,000,000 of the funds into SFNB in the form of a certificate of deposit. He then wrote a $4,000,000 check on his personal checking account with SFNB and deposited the check into Security. (Stockman did not have sufficient funds in his checking account to cover the check at the time of deposit.) Security did not deposit the Stockman check into its own account with United California Bank until January 2, 1964. Consequently, the funds appeared as deposits with Security over the year end, and as a certificate of deposit in SFNB. The withdrawal of funds from SFNB represented by the Stockman check was not recorded over the year end because of the float.

**11.** On the one hand, the transaction was undertaken by Security for its own purposes, unrelated to the SFNB, all participants denied that Security had purposely withheld the SFNB check from collection in order to create a float, and a float could have been created without overt manipulation of the parties if the transaction had been performed on December 31, 1963 (so that even if put through for collection in the normal course of business it would not have cleared until January 2). On the other hand, Security had helped inflate the assets of SFNB over the previous fixed call date, and it seems almost inconceivable that Security would inadvertently delay collection of a check in such a substantial amount.

conclude that these transactions are simply too far attenuated from the substance of Silverthorne's misrepresentations at issue in the instant case to negate justifiable reliance.

First, we note that the transactions alleged do not support the inference that Peters knew or should have known that SFNB was in serious financial trouble. There is no suggestion in the record that either of the call date transactions were done for the purpose of concealing an otherwise questionable or weak financial condition. From all appearances, the transactions were performed simply as "window dressing" to exaggerate what was, so far as Peters knew, an adequate financial performance.[12] Thus, Peters cannot realistically be viewed as possessing substantive knowledge contradicting Silverthorne's representations.

Second, while the various transactions detailed above suggest Silverthorne's capacity for misrepresentation, we do not feel that the implication of dishonesty thereby arising was so pervasive as to make Peters' reliance on him unjustified in all other contexts.[13] On balance, we conclude that Peters' reliance on Silverthorne's specific representations regarding the financial health of SFNB, as well as his explanation of the bank's previous default on Security's $250,000 certificate of deposit, was justified.

■ Accordingly, we find for plaintiff Security on its fraud cause of action.

### (B) Plaintiffs' "Insolvency" Claim

■ Plaintiffs' second theory of liability, applicable to both Security and Fidelity, is that SFNB's acceptance of their respective deposits while insolvent to the knowledge of Silverthorne, its president, was "dishonest" within the meaning of the blanket bond. The parties dispute both the applicable definition of insolvency and, assuming that plaintiffs' definition is adopted, whether SFNB was insolvent within the knowledge of Silverthorne at the time of the deposits in question.

The parties have sought authoritative guidance as to the meaning of the term "insolvent" by looking to cases defining that term as utilized by the National Banking Act, 12 U.S.C. § 21 et seq. Plaintiffs contend that a national bank is insolvent whenever it has an excess of liabilities over assets, while defendant argues that "insolvency" under the National Banking Act requires that the bank be unable to pay its debts as they mature in the ordinary course of business.

We find it unnecessary to determine what "insolvency" means for National Banking Act purposes, for we do not view the meaning of the term as utilized there dispositive of the instant claim. Under the National Banking Act, the Comptroller of the Currency, acting in the public interest, is delegated certain broad powers upon the insolvency of a national bank. That the policy considerations inherent in determining the circumstances under which Congress intended that delegation of authority to become effective might be wholly distinct from those applicable to plaintiffs' present claim is readily apparent. Here the task is to determine when the bank's financial condition is such that further acceptance of deposits is dishonest. The cases have utilized a specialized definition of insolvency to make this determination.

The line of cases primarily relied upon by plaintiff for the proposition that a bank's acceptance of deposits while insolvent is dishonest is St. Louis and S.F. Railway Co. v. Johnston, 133 U.S. 566, 10 S.Ct. 390, 33 L.Ed. 683 (1890), and its progeny. In that case, the Supreme Court upheld a state

---

**12.** What made SFNB's financial condition perilous was not its assets as reported on call date balance sheets, but rather the fact that many of the assets reported there were worthless. There is no evidence that Peters knew or should have known of these conditions.

**13.** The third transaction questioned by defendants, in which Peters allegedly used Security funds as a compensating balance for a personal loan from SFNB, while suggesting a conflict of interest in Peters' management of Security's affairs, adds little information about SFNB relevant to this litigation.

court's finding of fraud in the acceptance of certain deposits, stating that,

This bank was hopelessly insolvent when the deposit was made, made so by the operations of a firm of which the president of the bank was a member. The knowledge of the president was the knowledge of the bank. [Citations omitted.] In the latter case it was held that the acceptance of a deposit by a bank irretrievably insolvent, constituted such a fraud as entitled the depositor to reclaim his drafts or their proceeds. And the *anonymous case,* 67 N.Y. 598, was approved, where a draft was purchased from the defendants, who were bankers, when they were hopelessly insolvent, to their knowledge, and the court held the defendants guilty of fraud in contracting the debt, and said their conduct was not like that of a trader "who has become embarrassed and insolvent, and yet has reasonable hopes that by continuing in business he may retrieve his fortunes. In such a case he may buy goods on credit, making no false representations, without the necessary imputation of dishonesty." [Citations omitted.] But it is believed that no case can be found in the books holding that a trader who was hopelessly insolvent, knew that he could not pay his debts and that he must fail in business and thus disappoint his creditors, could honestly take advantage of a credit induced by his apparent prosperity and thus obtain property which he had every reason to believe he could never pay for. In such a case he does an act, the necessary result of which will be to defeat and defraud another and the intention to cheat will be inferred.

. . . . .

Granted that the mere omission to disclose the insolvency if there had been ground for the supposition that the bank might continue in business, would not be sufficient, there is nothing for such belief to rest on here.

133 U.S. at 576–77, 10 S.Ct. at 393.

*St. Louis* was followed by a number of state and federal cases holding similarly.

The leading Ninth Circuit case on point appears to be *Fidelity and Deposit Company of Maryland v. Kelso State Bank,* 287 F. 828 (9th Cir. 1923). That court found no fraud, observing that,

The court below, on the testimony heard in open court, found that, while the bank was in fact insolvent when it received the deposits in question, in that it did not possess sufficient solvent and marketable assets to meet its obligations, it was still a going concern and continued to receive deposits, pay checks, and to do general banking business for three days thereafter, until forced to close by order of the banking department. And said the [district] court: "So far as I can ascertain from the evidence, the officers of the bank did not know or believe at that time that the bank was hopelessly and irretrievably insolvent, but thought it would be able to continue in business." . . . This conclusion is amply sustained by the evidence.

287 F. 830. A state of "hopeless and irretrievable insolvency" has been almost uniformly required by the courts as prerequisite to finding fraud in a bank's acceptance of deposits. See e. g., *Poole v. Elliott,* 76 F.2d 772 (4th Cir. 1935); *Smith v. Zemurray,* 69 F.2d 5 (5th Cir. 1934); *Illinois Central R. Co. v. Rawlings,* 66 F.2d 146 (5th Cir. 1933); *Byrd v. Ross,* 58 F.2d 377 (S.D.Fla. 1932).

Even apart from the rationales upon which the foregoing cases are premised, the imposition of a demanding standard of insolvency is particularly apt in the instant case. It may be, as plaintiffs contend, that the SFNB was insolvent, in the sense of having an excess of liabilities over assets, for a period before it was closed by the Comptroller of the Currency. But this proves too much; for the Comptroller was during this period monitoring the bank's condition, and making visitations on a weekly and later daily basis to determine whether to exercise his authority pursuant to 12 U.S.C. § 192. Acting as representative of the public interest, the Comptroller determined that the SFNB should remain

open while various efforts were made to salvage it and reduce loss to depositors. To characterize as dishonest the acceptance of deposits during this period would not only unduly strain the concept of "dishonesty," but also quite possibly interfere with the discretion accorded the Comptroller under 12 U.S.C. § 192.[14]

A similar rationale was relied upon in part by the Supreme Court in striking down state laws imposing criminal liability upon national bank officers accepting deposits to insolvent banks. After concluding that the states had no power to define the duties of a national bank officer because, ". . . Congress has provided a symmetrical and complete scheme for the banks to be organized under the provisions of [the National Banking Act]," the court in *Easton v. Iowa*, 188 U.S. 220, 23 S.Ct. 288, 47 L.Ed. 452 (1903) noted that,

> The provision of the state statute is express that it is the duty of the officers of the bank, when they know it is insolvent, to at once suspend its active operations; for it is obvious, that to refuse to accept deposits would be equivalent to a cessation of business. Whether a bank is or is not actually insolvent may be, often, a hard question to answer. There may be good reason to believe that, though temporarily embarrassed, the bank's affairs may take a fortunate turn. Some of the assets that cannot at once be converted into money may be of a character to justify the expectation that, if actual and open insolvency be avoided, they may be ultimately collectable, and thus the ruin of the bank and its creditors be prevented. [Citation omitted.] But under the state statute, no such conservative action can be followed by the officers of the bank except at the risk of the penalties of fine and imprisonment. In such a case the provisions of the Federal statute would permit the comptroller to withhold closing the bank to give an opportunity to escape final insolvency. It would seem

that such an exercise of discretion on the part of the Comptroller would, in many cases be better for all concerned than the unyielding course of action prescribed by state law. However, it is not our province to vindicate the policy of the Federal statute, but to declare that it cannot be overridden by the policy of the State.

We hold that where, as here, the Comptroller of the Currency was closely monitoring the condition of the bank, and the bank was able to meet its obligations as they fell due, it was not dishonest for the bank to continue to accept deposits. Accordingly, plaintiffs' second theory of liability must fail.

### (C) *Plaintiffs' Dishonest Loans Theory*

Plaintiffs' third theory of recovery is that the making of dishonest loans caused the SFNB to fail, resulting in their respective losses. The issues raised by this claim are essentially twofold: (1) what loans made by the bank may be fairly characterized as "dishonest"; and (2) what is the casual relationship between the making of such dishonest loans and the losses suffered by plaintiffs.

Plaintiffs' case consisted of establishing that 61 borrowers of the SFNB had paid unlawful loan fees. The balance due from these borrowers at the time of the bank's closing was approximately $13,000,000, about one-third of all loans outstanding at the time of closure. Contending that the entirety of this sum, as well as certain other loans, must be characterized as "dishonest," plaintiffs contend that the losses resulting from these dishonest loans caused the bank to fail, and resulted in the nonpayment of their deposits. Thus, plaintiffs contend that their loss is attributable to "dishonesty."

Defendants proffer an entirely distinct analysis of plaintiffs' losses. First, defendants contend that plaintiffs have grossly overstated the amount of loans which may

---

**14.** Indeed, plaintiffs' own expert conceded that the Comptroller was aware of the bank's precarious financial condition, a fact confirmed by the bank examination reports in evidence be-

fore this court, and was probably correct in his determination to keep the bank open as long as possible while examining possibilities for salvaging it. See Tr. 2626–2631.

be fairly characterized as "dishonest." Rather than accepting as dishonest all loans made to borrowers who at any time paid a loan fee, defendants argue that only specific loans upon which loan fees were paid ought to be characterized as dishonest. At most, they contend, loan fee loans and subsequent loans to the same borrower ought to be counted.

Second, defendants contend that a very substantial proportion of the bank's losses derive from the nonpayment of *honest*, albeit negligent, loans. Thus, they argue that "dishonesty," the peril insured against, is only one of several sources of loss to the plaintiff. To this end, defendants introduced evidence concerning 187 so-called "honest" borrowers of the bank. The balance due from these borrowers at closing totaled over $8,000,000, of which $5,000,000 was never recovered.

Finally, defendants take issue with plaintiffs' theory that the closing of the bank "caused" plaintiffs' losses. Defendants contend that the plaintiffs' losses were caused not by the closing of the bank—which had no effect on the assets available to pay depositors—but rather from the nonpayment of individual loans. A bank with sound assets would be able to fully compensate its depositors notwithstanding the fact that an accounting had been triggered; what actually causes loss, defendants argue, is the inability of the bank to collect its outstanding loans. Since some uncollectable loans were honest, while others were dishonest, defendants contend that only that proportion of loss arising from the nonpayment of dishonest loans may be

properly attributable to dishonesty. Thus, defendants argue that dishonesty caused no loss resulting from the nonpayment of bad but honest loans.

We turn first to the issue of what loans may be fairly characterized as "dishonest." The various loans questioned by plaintiffs fall into five basic categories: (1) loans upon which loan fees were actually paid; (2) loans made to borrowers *prior* to their payment of a loan fee; (3) loans made to borrowers *subsequent* to their payment of a fee; (4) loans made so that borrowers could purchase SFNB stock; and (5) loans exceeding in amount the bank's lending limit.

 Loans upon which loan fees were paid present little problem of characterization. The pocketing of such loan fees was, of course, illegal.[15] Plaintiffs' expert, Mr. Sutherland, testified that, for the vast majority of loan fee borrowers, credit was extended by SFNB in kind and amount far exceeding the borrower's creditworthiness. Where a loan fee was taken by Silverthorne, and credit was extended beyond what would be justified by reasonable banking standards, we draw the inference that the loan fee loan was extended dishonestly. In a few cases, Mr. Sutherland conceded that the borrower's financial condition justified the loans involved, despite the presence of a loan fee. We exclude these loans from the dishonest category, inasmuch as the loan did not significantly increase the risk of loss to the bank, and because evidence that dishonesty actually motivated the transaction is lacking.[16]

---

**15.** Silverthorne's activity was a misapplication of bank funds in violation of 18 U.S.C. § 646. Mr. Sutherland testified that the charging of modest loan fees, taken for the benefit of the bank, is not regarded as dishonest.

**16.** Accordingly, loan fee loans to plaintiffs' "61 borrowers" are hereby found to be dishonest, with the exception of the Atkinson, Berger, Crooks Brothers, Martino, Rhine and Walden loans. Several loans, including Adams, Turner, Liberman and Dant, although characterized by plaintiffs' expert as "borderline," are included among "dishonest" loans on the basis of our finding that loan fees tipped the balance in favor of extending credit.

Plaintiffs also sought to attack as dishonest several loans among defendants' "187 borrowers" (as well as among 28 additional borrowers initially introduced by neither side) on the basis of loan fees, as evidenced by the presence of Bennett guarantees in their files. In view of the clearly established modus operandi of Bennett and Silverthorne, in which Bennett would guarantee credit of a questionable borrower, in exchange for a fee split between he and Silverthorne, we are willing to infer the existence of a loan fee from the presence of a Bennett guarantee. Accordingly, we find the Ralph Nichols and Beretta loan fee loans to be dishonest on the basis that a loan fee was accompanied by unjustified credit. As to other loans among

■ We are unwilling to regard as dishonest *all* loans made to borrowers who at one time paid a loan fee. Many borrowers had received credit from SFNB prior to the loan upon which a fee was paid. As conceded by Mr. Sutherland, in many cases this initial credit was justified by the borrowers' financial condition. In the absence of a loan fee, and in light of the creditworthiness of these loans, we find no basis upon which to infer that loans made prior to the payment of a loan fee were dishonest.

■ A more difficult question is presented as to loans made to borrowers *subsequent* to the payment of a loan fee. In a number of cases substantial credit was extended after the loan fee transaction. Inasmuch as Silverthorne had already extended unjustified credit to borrowers in exchange for loan fees, we may infer that he was aware that this further extension of credit was unjustified by the borrowers' financial condition, and imprudent by conventional banking standards. Silverthorne's motive for intentionally making further improper loans may have varied from case to case. In some instances, it appears that further credit may have been necessary to keep the borrower financially afloat so as to avoid the necessity of having to write off the asset as a bad debt. In other cases Silverthorne may have regarded the loan fee as consideration for a line of credit. In any event, the existence of a prior loan fee, taken in conjunction with the deliberate extension of further unjustified credit, leads us to conclude that Silverthorne acted not in good faith for the benefit of the bank, but rather for his own dishonest purposes.

■ In the absence of a loan fee, or other evidence of dishonest purpose, we do not characterize as dishonest those loans as to which the only evidence of misconduct is the fact that the loan exceeded in amount the bank's lending limit for individual borrowers. Although such loans are in violation of banking regulations, as we noted in our order of January 16, 1975, "[v]iolation of statutes relating to the operation of banks would not establish dishonesty per se. The conduct itself must be judged by the standard for dishonesty [previously set forth by the court]."

■ Finally, we turn to loans unlawfully made to borrowers for the purpose of purchasing SFNB stock. Where such loans are accompanied by testimony that the borrower was uncreditworthy, we conclude that the loan was dishonestly motivated.[17] Absent such evidence, however, we find the evidence of dishonest motivation insufficient.

Accordingly, for purposes of our analysis, "dishonest" loans include loan fee loans, subsequent loans made to loan fee borrowers, and SFNB stock loans, which were imprudent by customary banking practices.

From an examination of the record of the bank, as well as the exhibits drawn from those records and prepared by the parties, it is clear that the worthless loans made by SFNB in both categories, honest and dishonest, were substantial. At the time of the bank's closing, outstanding loans amounted to approximately $37,000,000. Of this sum, approximately $12,000,000 in loans were pledged as security for borrowing by SFNB from the Federal Reserve Bank. These loans were repaid in their entirety. Of the *unpledged* loans at closing approximately $13,000,000 represent the total balance due to borrowers who had paid loan fees. Nine million dollars of that sum remained unpaid at the time of trial, of which approximately $3,700,000 constitutes loan fee loans, while subsequent loans to loan fee borrowers account for several million dollars more. At the same time, almost $12,000,000 due at closing represented outstanding balances on accounts not involving loan fees or other forms of dishonesty. Ev-

this group involving Bennett guarantees there is no evidence that they were improper by conventional banking standards, and consequently insufficient evidence that dishonesty motivated the extension of credit.

17. Accordingly, we include in the dishonest category the Fisher and Maisin stock transaction loans.

idence was produced by defendants regarding 187 borrowers, representing $8.4 million of that amount. Of the $8.4 million due, almost $5,000,000 remained unpaid at the time of trial. In short, substantial sums were lost both on dishonest loans and loans that may be characterized as negligent but not dishonest.

All parties agree that the pool of unrecovered loan assets arising from the nonpayment of *dishonest* loans is loss "attributable to dishonesty." Defendants thus concede that plaintiffs are entitled to recover a portion of their individual losses—i. e., that percentage represented by the ratio of bank losses arising from dishonest loans compared to loss arising on all loans, honest and dishonest. The primary dispute between the parties centers around whether or not "dishonesty" may be attributed as a cause of loss arising from the nonpayment of *honest* loans.

Plaintiffs contend that dishonesty is responsible for their entire loss. Their claim is premised upon the argument that dishonest loans caused the bank to be closed, and that such closure deprived them of their full deposits. Defendants take the contrary position, as noted above, that closure of the bank caused no loss inasmuch as it did not affect the repayment of individual loans from which plaintiffs' loss ultimately derived.

Closure of the bank clearly caused no loss to depositors as a *class*. The assets available to the bank to pay its depositors remained the same after closure as before. In a sense, however, the timing of the closure was a cause of loss of these individual plaintiffs. Had the bank been able to survive for the period necessary for plaintiffs' respective certificates of deposit to mature and be withdrawn, plaintiffs would have suffered no loss, despite the losses suffered by the bank. The losses arising from the nonpayment of loans would have been visited upon other borrowers, or, had the bank managed to survive permanently, upon the shareholders. Inasmuch as losses from dishonest loans combined with losses from negligent (as well as other honest but bad loans) to produce closure of the bank, it is correct in a sense to say that dishonesty is a concurrent cause of the loss of plaintiffs' deposit.

For several reasons, however, it does not follow that defendants are liable for plaintiffs' entire loss. First, we do not believe that the contract of insurance at issue here contemplates that, whenever dishonesty is one of several factors responsible for the failure of a bank, the insurer would necessarily be liable for the entire loss. Such a holding would mean that, even if dishonesty accounted for a relatively small contribution to the bank's bad debts, lost deposits would be recoverable in full. Indeed, collectively, insurers would be liable under the standard blanket bond for all loss suffered by savings and loan institutions. At least where, as here, there is no basis for concluding that dishonesty alone was sufficient to cause the bank to fail,[18] we conclude that the blanket bond contemplates an apportionment of damages between dishonesty and other factors, if there is a reliable basis upon which such an apportionment can be made.

Apportionment of damages in the instant case is also analogous to the application of a

---

**18.** The court's order of January 10, 1975, indicated that plaintiffs might be entitled to recover their deposits in full if it could be shown that dishonest loans "by themselves" were sufficient to cause the bank to fail. We need not elaborate on this contingency at the present time, however, inasmuch as, on the record presented, plaintiffs have clearly failed to meet their burden of proof on this issue. First, we note that plaintiff failed to produce substantial expert testimony directed specifically to this point. In the absence of an expert opinion carefully analyzing the bank's financial condition at the time of closure, it would be entirely speculative for this court to estimate the impact of dishonest loans on the failure of the bank. Second, the probative value of Mr. Sutherland's opinion on this issue would be questionable in any event, in view of his assumption of a significantly broader definition of dishonest loans than that accepted by this court. At most on the present record we can conclude that dishonesty was one of several factors which combined to bring about the closure of the bank when it occurred.

familiar principle of tort law, under which damages caused by concurrent operation of distinct forces are to be apportioned if there is a rational basis to distinguish the respective contribution of each cause to the loss incurred. According to Section 433(a)(1) of the Restatement, Second, of Torts, "[d]amages for harm are to be apportioned among two or more causes where . . . there is a reasonable basis for determining the contribution of each cause to a single harm." Comment (a) to that section notes that, "[t]he rules stated in this Section apply whenever two or more causes have combined to bring about harm to the plaintiff, and each has been a substantial factor in producing the harm. . . . The rules stated also apply where one or more of the contributing causes is an innocent one . . . ." As noted by Prosser, "[t]he question is primarily not one of the fact of causation, but of the feasibility and practical convenience of splitting up the total harm into separate parts which may be attributed to each of two or more causes." Prosser, *Law of Torts*, § 52 at 313 (4th Ed.1971).

▮ We believe that a logical and equitable apportionment between dishonesty and other factors can be made in the instant case in accordance with the formula proposed by defendants. By computing the total unpaid balances of dishonest loans as of the present date, and comparing that figure to the total unpaid balance of all loans, a percentage figure is derived representing the proportionate share of loss to depositors attributable to dishonesty. That percentage can then be applied against plaintiffs' individual losses to calculate the proportion of their respective losses attributable to dishonesty. Plaintiffs shall recover under their dishonest loans theory of liability in accordance with this formula.

### Prejudgment Interest

In accordance with the court's order of January 10, 1975, plaintiff Security shall receive prejudgment interest on its liquidated fraud claim, while plaintiff Fidelity shall receive no prejudgment interest on its unliquidated dishonest loans claim.

### ORDER

Plaintiff Security shall prepare a judgment in its favor. Counsel for defendants Aetna Life and Casualty Company, Fireman's Fund Insurance Company and Republic Insurance Company are hereby ordered to prepare and submit to the court within 21 days an exhibit calculating, in accordance with the formula previously stated in this opinion, the percentage of plaintiff Fidelity's losses attributable to dishonesty under its dishonest loans theory.

SO ORDERED.